**Elizabeth A. BRANDON and James S. Muse, Plaintiffs,**

v.

**Robert J. ALLEN and E. Winslow Chapman, Defendants.**

**No. C–78–2076.**

United States District Court, W. D. Tennessee, W. D.

July 8, 1981.

G. Phillip Arnold, Memphis, Tenn., for plaintiff.

Henry Klein, Memphis, Tenn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

HORTON, District Judge.

This is a civil action against the Honorable E. Winslow Chapman, in his official capacity as Director of the Memphis Police Department, and former Memphis Police Officer Robert J. Allen. Plaintiffs, Elizabeth A. Brandon and James S. Muse, seek actual and punitive damages from the defendants for an assault and battery committed upon them by ex-officer Allen and for declaratory relief all pursuant to 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment to the Constitution of the United States. Due to his failure to appear or answer the charges in the complaint, a default judgment was entered against the defendant Robert J. Allen. The case was heard by the Court on September 29 and 30, 1980.

Plaintiffs allege the following:

1) An off-duty police officer acts under color of state law;
2) As Director of Police and as an agent of the City of Memphis, Mr. Chapman should have known of Mr. Allen's dangerous propensities;
3) Mr. Chapman should have taken steps to dismiss Mr. Allen from the Police Force prior to the occurrence of the incident involving plaintiffs;

4) Policies existed which precluded the Police Department from taking action to discover dangerous propensities among certain officers, and those policies encouraged "cover-up" of police misconduct;

5) Mr. Chapman's inaction was the cause of plaintiffs' pain, serious physical and emotional injuries, and property damage, and defendant's inaction denied plaintiffs equal protection of the law;

6) Mr. Chapman's willful, wanton, and reckless conduct constitutes a basis for an award of punitive damages.

Defendant E. Winslow Chapman, as an agent of the Memphis Police Department, presented the following defense:

1) He had no actual knowledge of the dangerous propensities of Officer Robert J. Allen;

2) It is impossible for the Police Director of more than 1,200 officers to be personally informed of each incident of police misconduct;

3) Upon his arrival as Police Director, he instituted a new policy, which provided for his personal involvement in cases of police misconduct;

4) Silence among police officers, review by the Civil Service Commission, and provisions of a union contract limited the Police Director's ability to discipline officers;

5) Officer Allen's disciplinary record at the time of the incident involving plaintiffs did not warrant dismissal from the Police Force;

6) Under the circumstances of this case, it cannot be said that Mr. Chapman should have known of Mr. Allen's dangerous propensities.

The Court, pursuant to Rule 52, Federal Rules of Civil Procedure, makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1) On March 5, 1977, at approximately 11:30 p. m. plaintiffs, who were seventeen years of age, drove to the Memphis Hunt and Polo Club while on a date and parked in a dark and secluded driveway area. The driver of the vehicle was plaintiff James S. Muse. After approximately thirty minutes had elapsed, a Chevrolet pickup truck entered the driveway where plaintiffs were parked. The truck proceeded down the driveway and returned a few minutes later, stopping near Mr. Muse's car. The driver of the truck identified himself to plaintiffs as a police officer and showed them an official police identification card bearing the name and photograph of Robert J. Allen. Mr. Allen was in fact employed as an officer with the Memphis Police Department, but he was off duty at that time. Mr. Allen ordered Mr. Muse to step out of the car. After briefly questioning him, Officer Allen maliciously, and without provocation, struck Mr. Muse in the neck and head with his fist and then stabbed and cut Muse on the neck and ear with a knife. As Officer Allen tried to break into the car where plaintiff Elizabeth A. Brandon was seated, Mr. Muse jumped into the driver's side of the car and quickly drove away. Officer Allen fired a shot at the escaping vehicle from his police revolver. The bullet shattered the front window on the driver's side of the car. Officer Allen followed plaintiffs in a high speed chase which ended at St. Joseph's Hospital East, where plaintiffs sought medical care and assistance and reported the unprovoked attack upon them by Officer Allen.

2) Miss Brandon was treated in the emergency room for facial cuts caused by the shattered glass. Later, a bullet fragment was removed from her face. Mr. Muse underwent three hours of plastic surgery and was hospitalized for two days. He was required to return to his physician periodically for additional treatment. Mr. Muse still has scars on his face.

3) Both plaintiffs have suffered great physical pain and anguish as a result of the incident. Miss Brandon testified that she has experienced nightmares, headaches, irritability, impatience, withdrawal, fear, and emotional distress. Mr. Muse testified that he has had difficulty sleeping since the incident. He has suffered fear and emotional

distress. He sustained damage to his car. Both plaintiffs testified they have lost respect for the police. Their senior year in high school was disrupted by the incident. There is evidence that plaintiffs are likely to bear some emotional scars from this experience for the remainder of their lives.

4) Although Officer Allen was technically off duty at the time of the incident, an off duty Memphis policeman is authorized to be armed. He is required to act if he observes the commission of a crime. The Court therefore finds that Officer Allen's use of his Memphis Police identification card and police service revolver were acts done under color of state law.

5) Officer Allen's reputation for displaying maladaptive behavior was well known among Police officers in his precinct. When informed of the incident involving plaintiffs, the following statements were made by Officer Allen's colleagues:

They finally caught up with him; he's a quack; Allen has done something this time that he can't get out of.

Allen's reputation as a "mental case" was widespread among the officers. Because none of the officers wished to ride in the same squad car with Officer Allen, he was frequently relegated to ride by himself. He was known to have bragged about killing a man in the course of duty. Officer Allen had often stated to other officers that he wished he knew the exact bullet spread in the chest of the man he killed. Officer Allen referred to a pair of gloves in his possession as his "killing gloves," and he would ceremoniously put those gloves on his hands when he was called to the scene of a crime.

6) At least on one prior occasion, an officer reported Officer Allen's morbid conduct to a supervisor. Officer Joe Davis made that report to Captain D. A. Moore and requested that he be assigned to ride with someone other than Officer Allen. As long as Captain Moore was at Mr. Davis' precinct, this request was honored for the most part.

7) At least two *formal* complaints were filed with the Memphis Police Department by citizens against Officer Allen prior to the incident involving plaintiffs. Kathleen Myrick had filed a complaint alleging "conduct unbecoming of an officer." Jeanne DeBlock testified that Officer Allen had stopped her on the interstate highway, ordered her into his squad car and taunted her for about an hour and a half. During that time he ordered her to repeat her story to him at least four times. When he released her, she called him a name, and he threw her back into his squad car, taunted her for at least another hour, took her to jail for the night and impounded her car. Although she had presented a valid driver's license when asked, Officer Allen charged her with driving without a license and speeding. Officer Allen was given an oral reprimand based upon Ms. Myrick's complaint. No action was taken against him for Ms. DeBlock's complaint. Upon his departure from the Memphis Police Department in March of 1977, twenty complaints against Officer Allen were part of his police file records. Those included complaints for serious abuse of police authority and use of unnecessary force. Officer Allen had received several commendations while a police officer. He was subsequently convicted and imprisoned for his role in the incident involving plaintiffs.

8) Defendant Chapman has been Police Director since his appointment in September, 1976. Prior to his Administration, there was no direct involvement of the Police Director with matters of officer misconduct. Mr. Chapman devised procedures which provided for his personal involvement with matters of misconduct. Those procedures were not implemented until early in the year of 1977. The old procedure was followed until Director Chapman's new procedures were adopted and implemented. The new procedures operated prospectively. Thus, Mr. Chapman was not apprised of Officer Allen's disciplinary record, since he had failed to review the existing records of police officers relating to misconduct.

9) Even under the new procedures implemented by Mr. Chapman, Officer Allen would not have been dismissed from the

Memphis Police Department based upon his police disciplinary record at the time of the incident involving plaintiffs. The new procedures failed to encourage or impose any duty on officers to file formal complaints on their own initiative against other officers when warranted. Mr. Chapman's plan also failed to impose a duty on supervisors to take action to seek out and discover officers who might have dangerous propensities. Even under the new procedures, immediate supervisors of the officers were insulated from knowledge of officer misconduct. In the absence of the filing of formal complaints by either citizens or officers, Mr. Chapman was almost always uninformed of police officer misconduct. No direct action was taken by the Police Director to seek out incidents of officer misconduct from immediate supervisors.

10) Mr. Chapman had no personal knowledge of Officer Allen's dangerous propensities nor did many of the other supervisors within the hierarchy of the police department.

11) Serious limitations hindered the police department and its Director from disciplining errant officers. Those factors included a code of silence among the officers, restrictive provisions within the union contract, and review of police disciplinary actions by a Civil Service Review Board. In a previous case, Mr. Chapman testified that he fired an officer charged with pistol-whipping a citizen and dismissed another officer charged with breaking the limbs of a prisoner. In both cases the Civil Service Review Board reinstated the officers. Because of those constraints, Mr. Chapman believed that it was better to take no disciplinary action against an officer than to take action and be reversed by the Civil Service Review Board.

12) Standard form letters were routinely sent to citizens in response to their formal complaints. Those letters were signed by Mr. Chapman and assured complainants that the matter in question had been properly acted upon by the Police Department. Such letters were sent to Ms. Myrick and Ms. DeBlock in response to prior complaints made against Officer Allen.

### CONCLUSIONS OF LAW

Plaintiffs have filed an action for damages for assault and battery and declaratory relief arising under 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment to the Constitution of the United States. Plaintiffs seek to redress the deprivation of rights, under color of Tennessee law, secured to them by said statutory and constitutional provisions. The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

Defendants in this case are Robert J. Allen, a former police officer who was off duty at the time of the incident in question, and the Honorable E. Winslow Chapman, Director of the Memphis Police Department. Because Mr. Allen failed to answer the complaint, a default judgment was entered against him.

Mr. Chapman was sued in his official capacity as an agent of the Memphis Police Department. According to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 635 (1978): "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.... [O]ur holding ... decides that local government officials sued in their official capacities are 'persons' under § 1983...."

Title 42, section 1983, United States Code provides in part as follows:

§ 1983. Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Taylor v. Grindstaff*, 467 F.Supp. 4, 5 (E.D.Tenn.1978), the Court stated the following:

Two elements are requisite for recovery under the Federal Civil Rights Act, *i. e.*, conduct under color of state law by the person(s) whose conduct is complained of, and the subjection of the plaintiff by such conduct to the deprivation of rights, privileges and immunities secured to him by the federal Constitution and laws. *Basista v. Weir*, 340 F.2d 74, 79 (3rd Cir. 1965).

■ For one to be liable under this provision, he must act under "color of law," and in doing so he must play an "affirmative part" in the deprivation of the constitutional rights of another. See *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). According to *Henig v. Odorioso*, 385 F.2d 491, 494 (3rd Cir. 1967):

> [M]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law [is action taken under color of law]. See *U. S. v. Classic*, 313 U.S. 299 at 326 [61 S.Ct. 1031, 1043, 85 L.Ed. 1368] (1940).

Furthermore, the United States Supreme Court in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961), stated the following:

> There can be no doubt ... that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.

■ Mr. Chapman could not be held liable under any theory for the actions of the off duty officer Allen, as long as Officer Allen had failed to act under "color of law." However, when Officer Allen displayed his official police identification and used his police revolver, he acted under "color of law."

It has been held that a Police Chief played an "affirmative part" in the deprivation of constitutional rights "if [he] deployed or hired an officer under conditions which he should have known would create a threat to the constitutional rights of the citizenry ...." *Kostka v. Hogg*, 560 F.2d 37, 40 (1st Cir. 1977). However, such a federal official is under no duty to anticipate unforeseeable constitutional developments. *Mitchell v. King*, 537 F.2d 385, 389 (10th Cir. 1976). Moreover, in the case of *Rizzo v. Goode, supra,* a class action suit where only equitable relief was sought, the Supreme Court held that the Federal District Court exceeded its authority when it required defendant to adopt a revised program to govern the manner by which complaints against officers would be handled.

■ Both parties to this case have agreed that Mr. Chapman had no actual knowledge of Officer Allen's dangerous propensities. Thus, the sole issue is whether Director Chapman *should have known* that Officer Allen's dangerous propensities created a threat to the rights and safety of citizens. Because Mr. Chapman, as Police Director, should have known of Officer Allen's dangerous propensities the Court finds that he must be held liable, in his official capacity, to the plaintiffs.

■ Police officers are vested by law with great responsibility. As a result, they must be held to high standards of official conduct. In the absence of high standards of official conduct, the likelihood of abuse of police authority and deprivation of citizens' civil rights is very great. Officials of the Police Department must become informed of the presence in the Department of officers who pose a threat of danger to the safety of the community. Likewise, when knowledge of a particular officer's dangerous propensities is widespread among the ranks of police officers, the Police Department's officials must understand that a threat to the safety of the community exists.

In this case, Mr. Chapman failed to take proper action to become informed of Officer Allen's dangerous propensities. For example, upon his appointment as Police Director, Mr. Chapman failed to review the disciplinary records of officers prior to the incident involving the plaintiffs. Even if he had done so, it is doubtful that Mr. Chapman would have been apprised of Offi-

cer Allen's dangerous propensities under departmental procedures then instituted by Mr. Chapman. This is because only if a formal complaint were filed by either a policeman or a citizen would the Police Director ever be informed of an officer's dangerous propensities or of police misconduct.

Due to a code of silence induced by peer pressure among the rank-and-file officers and among some police supervisors, few-if any-formal complaints were ever filed by police personnel. Furthermore, when complaints were filed by citizens, little disciplinary action was apparently taken against the offending officer. Instead, a standard form letter, bearing Mr. Chapman's signature, was mailed to each complainant, assuring the person that appropriate action had been taken by the Police Department, even if such action had not in fact been taken. This tended to discourage follow-up measures by the complaining citizen. Perhaps, Mr. Chapman's belief that it was better to take no disciplinary action than to act and later be reversed by a review board was responsible for this obviously inadequate solution. The end result was twofold: 1) Mr. Chapman's procedures were highly conducive to "covering up" officer misconduct; 2) the Police Director and many of his supervisors were totally insulated from knowledge of wrongdoing by officers as a result of policies in effect during that period of Mr. Chapman's relatively new administration. In other words, due to the inherently deficient nature of police administrative procedures involving the discovery of officer misconduct, Mr. Chapman seldom knew of misconduct matters which he should have known, such as Officer Allen's dangerous propensities.

Officer Allen's reputation for maladaptive behavior was widespread among the officers of his precinct. Furthermore, at least one of the officers personally informed one of the chief precinct supervisors of Mr. Allen's morbid tendencies. Nevertheless, investigation and action by this supervisor were not undertaken as a result of those procedures then in effect during this period of Mr. Chapman's directorship. Under these circumstances, it would require feats of mental gymnastics to believe that Mr. Allen's immediate supervisors were not aware of the dangerous situation created by Officer Allen's presence on the Memphis police force. Still, there was apparently no communication between Mr. Chapman and those supervisors regarding Officer Allen's dangerous propensities.

Mr. Chapman has, in effect, asked the Court to find as acceptable unjustified inaction. This the Court cannot do. The evidence does not permit the Court to do so. The plaintiffs in this case were seriously frightened and injured by Officer Allen. The attack upon them was willful, wanton, unprovoked and brutal. Because he should have known of Officer Allen's dangerous propensities considering the totality of all of the circumstances of this case and because he should have taken steps to dismiss Officer Allen from the police force, Director Chapman's unjustified inaction was the cause of plaintiffs' damages and injuries. Accordingly, Mr. Chapman in his capacity as Director of the Memphis Police Department must be held liable to plaintiffs in this case.

The disposition of this case, upon all of the evidence presented at the hearing, does not blind the Court to the fine record of Mr. Chapman. Neither is the Court unaware that the Memphis Police Department is staffed by very fine men and women. This Court can note with satisfaction the progress made by that Department under the progressive Directorship of Mr. Chapman. In this case, the Court is dealing with evidence pertaining to only one obviously dangerous police officer, former Officer Allen. The overwhelming evidence, and not just a preponderance of the evidence, shows that it was a real and present danger to the City of Memphis and its citizens for Officer Allen to have been on the Memphis Police Department at the time this terrible incident occurred. His dangerous propensities were widely known among officers of the Department. Officer Allen inflicted severe and painful injuries upon two innocent young people. Considering all the facts, Mr. Chapman, though relatively new in his

job at the time, should have known of Allen's dangerous propensities.

It is therefore by the Court

ORDERED that the defendants be held liable in damages to the plaintiffs. The Court will, after a period of 30 days from the date of this order, refer the case to a United States Magistrate for a prompt hearing on the issue of damages and for a recommendation to the Court on the amount of damages that should be awarded plaintiffs. If this matter of damages can be resolved by the parties to this action within the 30 days, then no hearing by a Magistrate will be necessary. The parties can simply present an appropriate order to the Court.