Elizabeth BRANDON, et al., Plaintiffs,

v.

Robert J. ALLEN, et al., Defendants.

No. 78–2076 H.

United States District Court,
W.D. Tennessee, W.D.

Oct. 7, 1986.

Henry L. Klein, Sr. Staff Atty., Clifford D. Pierce, City Atty., Memphis, Tenn., for defendants.

Elizabeth A. McKanna, Memphis, Tenn., for plaintiffs.

ORDER UPON RECONSIDERATION OF CASE, AWARDING COMPENSATORY DAMAGES, PUNITIVE DAMAGES ATTORNEY'S FEES, COSTS, INTEREST

HORTON, District Judge.

The United States Court of Appeals for the Sixth Circuit, by order dated November 8, 1985, remanded this case to this Court, with instructions. The order reads:

This case is remanded to the District Court for reconsideration in light of the Supreme Court's decision in *Brandon v. Holt*, No. 83–1622 [469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878] (January 21, 1985), reversing 719 F.2d 151 (6th Cir. 1983). The District Court's opinion below does not address or apply the "policy or custom" requirement for municipal Section 1983 liability under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 [98 S.Ct. 2018, 2037, 56 L.Ed.2d 611] (1978), an apparent prerequisite for liability when a municipal official is sued "in his official capacity" since any such judgment is now deemed to be against the municipality rather than the individual, although the municipality is not expressly named as a party.

The defendants, through the City Attorney for the City of Memphis, Tennessee, moved the Court to dismiss this cause of action with prejudice. In support of their motion, the defendants claim:

(1) The case was not tried in accordance with the proper standard to impose liability upon a municipal official sued in his official capacity.

(2) The opinion of the Court did not address or apply the "policy or custom" requirement for municipal liability or liability of a municipal official acting in his official capacity.

(3) The plaintiffs are estopped from seeking to impose liability against defendants based upon "policy or custom" pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (1978).

(4) Plaintiffs have waived their right to proceed in this cause under the theory of "policy or custom" pursuant to *Monell.*

(5) The facts do not support a finding of municipal liability pursuant to *Monell.*

(6) The complaint fails to state a claim upon which relief can be granted. .

The Court, upon reconsideration, denies the motion of the defendants to dismiss this cause of action with prejudice. The Supreme Court of the United States in *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985) permitted the plaintiffs, pursuant to Rule 15(b), Federal Rules of Civil Procedure "to amend their pleadings to conform to the proof and to the District Court's findings of fact." The Supreme Court apparently understood the proof in this trial record and the Court's findings of fact addressed and made findings of fact based upon policies in effect at the Memphis Police Department when the incident giving rise to this case occurred. By way of illustration, the Supreme Court's opinion at page 875 reads:

E. Winslow Chapman had been the director of the Memphis Police Department for approximately six months when Officer Allen attacked the petitioners. It is undisputed that Chapman had no actual knowledge of Allen's disciplinary record. The Court found, however, that "Director Chapman should have known that Officer Allen's dangerous propensities created a threat to the rights and safety of citizens." [5] The director's lack of actual knowledge of Allen's propensities was found to have been caused by the "policies in effect during that period of Mr. Chapman's relatively new administration," which policies included "the inherently deficient nature of police administrative procedures involving the discovery of officer misconduct." [6]

Footnote 6 in the Supreme Court's opinion reads:

Regarding these policies and procedures, the District Court wrote:

"Due to a code of silence induced by peer pressure among the rank-and-file officers and among some police supervisors, few—if any—formal complaints were ever filed by police personnel. Furthermore, when complaints were filed by citizens, little disciplinary action was apparently taken against the offending officer. Instead, a standard form letter, bearing Mr. Chapman's signature, was mailed to each complainant, assuring the person that appropriate action had been taken by the Police Department, even if such action had not in fact been taken. This

tended to discourage follow-up measures by the complaining citizen. Perhaps, Mr. Chapman's belief that it was better to take no disciplinary action than to act and later be reversed by a review board was responsible for this obviously inadequate solution. The end result was two-fold: 1) Mr. Chapman's procedures were highly conducive to 'covering up' officer misconduct; 2) the Police Director and many of his supervisors were totally insulated from knowledge of wrongdoing by officers as a result of policies in effect during that period of Mr. Chapman's relatively new administration."

Plaintiffs in this case suffered serious personal and psychological injury as the direct result of the official policies of the Memphis Police Department. It is therefore obvious the first five reasons in support of defendants' motion to dismiss are without merit. The sixth and final reason, that the complaint does not state a claim upon which relief can be granted, is also without merit. While the defendants do not specifically say so, this failure to state a claim reason appears to be a 12(b)(6) motion under the Federal Rules of Civil Procedure. When evaluating a motion under this rule, the complaint should not be dismissed unless it appears beyond doubt plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). The Court concludes the amended complaint does state claims upon which relief can be granted pursuant to the policy or custom prerequisite to municipal liability under *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Plaintiffs claim there are three issues requiring resolution by the Court: (1) whether the facts establish the requisite "policy or custom" for municipal liability under 42 U.S.C. Section 1983 and *Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); (2) the proper measure of damages to be awarded plaintiffs for injuries they suffered as a result of established violations of their constitutional rights; and (3) plaintiffs' application for an award of costs and attorneys' fees to their counsel.

Upon reconsideration of this case, as directed by the United States Court of Appeals for the Sixth Circuit, this Court concludes, upon review of the entire record, plaintiffs identified policy and custom of the Memphis Police Department *and* established by credible proof their personal injuries resulted directly to them as a result of that identified official policy and custom of the Memphis Police Department. They are therefore entitled to be awarded damages under *Monell* and entitled to attorneys' fees and costs.

The Court awards compensatory damages to plaintiff Elizabeth Brandon in the amount of $10,000 and to plaintiff James Sherman Muse in the amount of $41,310.75, jointly and severally against the defendant John D. Holt, in his official capacity, to be paid by the City of Memphis, Tennessee, and defendant Robert J. Allen in his personal capacity. The Magistrate's recommendation of an award of $25,000 punitive damages to *each* plaintiff against defendant Robert J. Allen is approved and confirmed. Section 1961, Title 28, United States Code, provides for the allowance of interest on any money judgment in a civil case recovered in a district court. Pursuant to that section, the Court allows interest on the money judgments recovered in this case as of May 5, 1982, at the Treasury Bill rate then prevailing and upon the additional damages from the date of this decision until paid.

Plaintiffs are also entitled to recover attorneys' fees and costs. The Court awards to plaintiffs, Elizabeth Brandon and James Sherman Muse attorneys' fees in the amount of $116,278.75 and an award of $5,876.23 for costs and litigation expenses. Interest upon this award of attorneys' fees and costs shall accrue at the legal rate as provided in 28 U.S.C. Section 1961 until paid.

Having made its own independent determination, upon reconsideration of this entire case, that plaintiffs are entitled to recover compensatory damages, attorneys' fees and costs with interest, against the defendants Holt, in his official capacity to be paid by the City of Memphis, Tennessee, and Allen jointly and severally, and punitive damages against Allen, the Court finds the proposed findings and conclusions presented by plaintiffs support the Court's findings and judgment in this case. The Court therefore adopts and incorporates into this opinion the following findings and conclusions submitted by plaintiffs.

### MUNICIPAL "POLICY OR CUSTOM"

The facts of this case are not in serious dispute. Rather, it is the legal significance of the facts that has prolonged the litigation and delayed the final judgment to which plaintiffs are entitled. The Court's previous findings, reported in 516 F.Supp. 1355, were not disturbed by the appellate courts. Only those facts which are relevant to the question of municipal "policy or custom" need be briefly recounted here.

The officer who assaulted plaintiffs, as the Court previously found, was an "obviously dangerous man" whose "dangerous propensities were widely known among officers of the Department" prior to the attack of March 5, 1977. 516 F.Supp. at 1361. The Court found (*id.* at 1358):[1]

Allen's reputation as a "mental case" was widespread among the officers. Because none of the officers wished to ride in the same squad car with Officer Allen, he was frequently relegated to ride by himself.

Among the statements made by Allen's fellow officers following the assault on petitioners were "they finally caught up with him"[2] and "Allen has finally done something this time that he can't get out of."[3] Three days after the attack, the Commander of the Special Operations Bureau described Allen as "a walking time bomb."[4]

Allen's reputation within the Memphis Police Department was well deserved. When Allen was first hired as a police officer, a psychiatrist retained by the City to evaluate such applicants warned that Allen

may ... have difficulty controlling his impulses.... [h]is test data indicated some maladaptive behavior, thus he should be observed and supervised.[5]

By the time of the assault on petitioners some 20 complaints had been filed against Allen, including charges for serious abuse of policy authority and use of unnecessary force. 615 F.Supp. at 1358. Allen had been suspended on one occasion for beating an inmate at the city jail.[6] On another occasion Allen, apparently angry that a woman had reported a burglary, stopped her car on an interstate highway,

ordered her into his squad car and taunted her for about an hour and a half.... When he released her, she called him a name, and he threw her back into his squad car, taunted her for at least another hour, took her to jail for the night and impounded her car. Although she had presented a valid driver's license when asked, Officer Allen charged her with driving without a license.[7]

No action had been taken by the Department regarding the complaint filed with regard to this incident. *Id.*

---

1. *See also* Tr. 147 (refused to ride with Allen; "mental case"), 156 (refusal to ride with Allen; "mental case"), 161 (refusal to ride with Allen).

2. 516 F.Supp. at 1358; Tr. 47.

3. *Id.,* Tr. 70, 81.

4. *See The Commercial Appeal,* 8 March 1977.

5. Exhibit 4 to Deposition of E. Winslow Chapman. Chapman stated that under the Department's procedures neither Allen's precinct commander nor anyone else would have seen this warning after he was hired. Dep. pp. 18–19.

6. Tr. 223–25.

7. 516 F.Supp. at 1358. The victim testified: "[He] knocked me up against the hood, grabbed me by the arm, and opened the door, and literally threw me in the police car." Tr. 120. She characterized Allen's conduct during her ordeal as "crazy." Tr. 118.

Allen's most bizarre conduct apparently arose out of an incident in 1975 when he shot and killed a teenage black youth.[8] On October 18, 1975, Allen spotted the victim apparently engaged in stealing a television set from a closed hotel. After chasing the suspect on foot, Allen drew his service revolver and shot him. The circumstances of the killing prompted authorities to refer the case to the grand jury, but the grand jury refused to indict Allen.[9] Thereafter Allen repeatedly bragged about the killing; a fellow officer remarked of Allen, "[H]e thought it was a great thing, you know to be a police officer and kill somebody."[10] Allen expressed to his fellow officers a morbid interest in the nature of the lethal wounds he had inflicted on his victim.[11] Allen referred to a pair of gloves in his possession as his "killing gloves," and he would ceremoniously put on those gloves when he was called to the scene of a crime. *Id.*[12]

Officer Allen, in short, was an obviously and exceptionally dangerous man whom no sensible police department would have armed with a gun and a badge and set loose on the local citizenry. The Court found that Allen's immediate supervisors were aware of his dangerous propensities. *Id.* at 1361. One of Allen's fellow officers, in successfully seeking to avoid riding in a squad car with Allen, had described Allen's abberant behavior to their captain,[13] and Allen himself stated that he had spoken about his problems with "upper echelon people."[14] The Court earlier concluded and again finds that Allen had been kept on the force despite his well known propensity for violence as a result of four Memphis City policies.

First, the procedures followed by Chapman and his predecessors deliberately and systematically insulated the Director of Police from any knowledge of violence or other misconduct by police officers, thus assuring that they would never take steps to correct or prevent such action. 516 F.Supp. at 1359 and 1361. At least until 1977, it was Departmental policy never to show the Director complaints or internal reports regarding police brutality.[15] Even though Director Chapman sent an individual letter to every person filing such a complaint, assuring the complainant that the matter was being investigated, the form letter Chapman signed never mentioned either the incident complained of or the name of the officer involved, thus leaving Chapman ignorant of what his subordinates were doing.[16] Under procedures which still remained in effect at the time of the trial, the Department imposed on its supervisors no duty to discover officers who might have dangerous propensities, and no duty to report known problems to Chapman or anyone else. *Id.* at 1358–59. The Police Director had never taken any affirmative steps to learn of officer misconduct from precinct level supervisors. *Id.*

Second, there was throughout the Department a code of silence binding patrolmen and supervisors alike not to testify against or report on their colleagues. *Id.* at 1359, 1361. That code was enforced by peer pressure, and tacitly sanctioned by the refusal of the Department to impose on its

---

**8.** Tr. 145, 243–45. The details of the incident are set out in a Firearms Use Report filed by Allen. There was no claim that the victim was armed.

**9.** Tr. 157–58.

**10.** 516 F.Supp. at 1358; Tr. 148.

**11.** *Id.,;* Tr. 151. ("You know, guys, I sure would like to get that lead, and see what kind of spread it had when it went in him, what kind of damage it did to him.")

**12.** Allen later said of the effect of the 1975 shooting, "I was not mentally strong enough to

hold a job as a police officer.... I had occasion to shoot a man and I killed him in the line of duty. I was not able to comprehend that or to carry that burden." Transcript of Hearing Before Magistrate, 1982, p. 4.

**13.** Tr. 147, 158–59.

**14.** Transcript of Hearing Before Magistrate, p. 5.

**15.** Tr. 172–74, 215–17.

**16.** 516 F.Supp. at 1358–59 and 1361; Tr. 185, 189.

employees any obligation to disclose, even under questioning, misconduct by their fellow officers. *Id.* at 1359. Chapman candidly acknowledged, "We have never, since I have been director, had the first single case where officers would really cooperate in terms of telling us on an official basis what they knew about a fellow officer."[17] The only step Chapman ever took to end this practice was to provide a psychological counseling service for officers.[18] The code of silence which pervaded the Department and was tolerated and effectively sanctioned by its highest officials was precisely the sort of custom referred to in *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

Third, until July of 1980 it was the policy of the Department never to reassign an officer from a position for disciplinary reasons. As Chapman explained, "any transfer for any wrongdoing or for any suspect of wrongdoing ... was specifically prohibited."[19] Because of this restriction, which for years was contained in the agreement between the city and the police union (516 F.Supp. at 1359), Chapman would not and could not have reassigned a violent officer from patrol work to a desk job. The termination of this policy in 1980 had in Chapman's words "very positive results" (Tr. 193), but it was a change which came several years too late to prevent the assault on plaintiffs.

Finally, any disciplinary action involving the dismissal of an officer or a suspension in excess of 10 days required approval of the City Civil Service Commission, whose members were chosen by the Mayor. It was in Chapman's view the policy[20] of the Commission never to uphold the dismissal of an officer if it were based on violent misconduct.[21] Chapman testified that he had on one occasion attempted to dismiss an officer whose conduct he described as "very similar to" Allen. That officer had threatened to shoot his lieutenant, and had become so excited while pistol-whipping a defendant that he passed out.[22] The Civil Service Commission, however, reinstated the dismissed officer.[23] Based on that case and similar incidents it was apparently Chapman's practice not to attempt to fire an officer for brutality, since he believed such dismissals would inevitably be overturned.[24]

Chapman accurately characterized the disciplinary situation within the Department at the time of the assault on petitioners as "hopeless."[25] Under the City policies then in effect the Director was insulated from information regarding officers whom even their colleagues knew to be unstable and dangerous, and the Department was unwilling to actually mete out any significant punishment to officers found guilty of misconduct. Immune from any scrutiny by the Police Department, Memphis police officers were armed not only with a gun but also with a license to attack citizens virtually at will. Chapman acknowledged, "in my opinion ... probably many cases were not handled as they should be. It was not the emphasis on the responsibility of the department or the individual officers as there should have been." Tr. 208–09. Officer Allen was clearly one of those mishandled cases.

The foregoing findings are compelled by the record; no alternative view of the facts is possible. The question remains, however, whether the above-described policies, procedures and customs, which effectively positioned officer Allen to do great constitutional harm to plaintiffs, constitute the sort of governmental "policy or custom" to which § 1983 municipal liability attaches under *Monell.* The Court feels equally

---

**17.** Tr. 178; *see also* Tr. 184, 196, 202–03, 204, 210.

**18.** Tr. 204.

**19.** Tr. 192; *see also* Tr. 178, 193, 196–98, 199.

**20.** Tr. 180, 195.

**21.** 516 F.Supp. at 1359, 1361.

**22.** Tr. 183–84.

**23.** Tr. 184; 516 F.Supp. at 1359; *see also* Tr. 208.

**24.** 516 F.Supp. at 1359; Tr. 195.

**25.** Tr. 198.

compelled to conclude that such municipal liability is clearly established. *Monell* overruled the earlier decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that municipalities could not be named as defendants in civil rights actions brought under 42 U.S.C. § 1983. While announcing that municipalities could be held liable in section 1983 actions, *Monell* also held that such liability could not be imposed on a mere showing that the individual responsible for causing a violation of the Constitution happened to be a city employee. *Monell* concluded that the common law rule of *respondeat superior* was inconsistent with the legislative history of section 1983, and that damages may be awarded only if the constitutional violation at issue was caused by "a government's policy or custom." 436 U.S. at 694, 98 S.Ct. at 2037.

*Monell* indicated that this requirement of a government custom or policy could be satisfied in several different ways. First, a policy statement, ordinance, regulation or decision might be formally adopted by the city's highest ranking official or officials. See 435 U.S. at 690, 98 S.Ct. at 2035. As to any particular decision regarding government conduct, there must be one person, or group of persons, who can make the ultimate determination as to what will occur. That individual or group, whom the lower courts have labeled the "final authority",[26] may exercise legislative, executive, or judicial functions. The actions of such a final authority are necessarily official policies within the meaning of *Monell*.

The Supreme Court has just recently confirmed the correctness of this understanding of *Monell*. In *Pembaur v. City of Cincinnati*, —— U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court reversed a Sixth Circuit judgment holding that a *single* decision of a county policy-

making official was insufficient to establish the sort of government "policy" contemplated by *Monell*. The Court held that § 1983 municipal liability attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at ——, 106 S.Ct. at 1300. *Pembaur* thus recognized that in any governmental body much of the responsibility for making official policy or decisions will ordinarily be delegated by the mayor, city council, or other final authorities to lower ranking government officials.[27] In cities and counties where policy making authority is often delegated in a casual manner far different from the formal allocation of responsibility at the higher levels of federal agencies, the actual authority traditionally and overtly exercised by a particular official will often be the best guide as to the nature of his or her role in framing official policies or taking official action. See Schnapper, *Civil Rights Litigation After* Monell, 79 COLUM.L.REV. 213, 219 (1979).

*Monell* also held that a city or county could be held liable for constitutional violations caused by an official custom. See *Pembaur*, —— U.S. at —— n. 10, 106 S.Ct. at 1299 n. 10. This rule has its roots in the language of section 1983 itself, which provides a cause of action for certain conduct " ... under color of any law, statute, ordinance, regulation, custom, or usage of any State...." The Court in *Monell* noted that in framing section 1983 Congress had "included such customs and usage because of persistent and widespread discriminatory practices by state officials." 436 U.S. at 691, 98 S.Ct. at 2036. *Monell* emphasized that the actual practices of government officials were often a better indication of

---

**26.** *See, e.g. Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir.1980); *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir.1980).

**27.** The lower courts have consistently recognized that *Monell* is satisfied where the official responsible for the constitutional violation had been exercising delegated authority or discre-

tion. *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir.1982); *Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1112 (5th Cir.1980); *Peters v. Township of Hopewell*, 534 F.Supp. 1324 (D.N.J.1982); *Katris v. City of Waukegan*, 498 F.Supp. 48, 51 (N.D.Ill. 1980).

 **1269**

official policy than ordinances or regulations which *ignored or even forbade those practices:*

It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books.... Settled state practice ... can establish what is state law.... Deeply embedded traditional ways of carrying out state policy ... are often tougher and truer law than the dead words of the written text.

436 U.S. at 691 n. 56, 98 S.Ct. at 2036 n. 56. *See Yick Wo. v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

 As demonstrated by the legislative history of § 1983 canvassed in *Monell* and other cases, *e.g., Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); the Congress that framed the statute was particularly concerned about the widespread refusal of local law enforcement officials in 1871 to enforce state criminal laws against members of the Ku Klux Klan and others who attacked blacks and Republicans. The nominal policy of the former rebel states, as announced by their statutes, was to protect all citizens from violence without regard to their race or party; the actual policies of those states, however, were very different. As one member of the forty-second Congress noted, "Sheriffs, having eyes to see, see not; judges having ears to hear, hear not...."[28] A practice is to be deemed an official custom, *inter alia,* if it occurs with sufficient frequency and notoriety as to make it known to responsible supervisory officials and those officials decline to take effective action to end that practice.[29]

 The practices identified by the Court as causing the constitutional viola-

tion at issue in this case clearly satisfy the requirements of *Monell* and *Pembaur.* The policy of not dismissing violent officers was embraced by both the Police Director and the Memphis Civil Service Commission. The policy of not transferring officers for disciplinary reasons was adhered to by the Police Director and expressly agreed to by the Mayor. The policy of insulating the Police Director from all civilian complaints of misconduct was adopted, as it was later modified, by the Police Director himself. It could not be suggested that the Mayor, Police Director or Civil Service Commission lacked the authority to adopt any of these well established and well known policies.

The code of silence that prevailed among Memphis police officers is precisely the type of custom with which the framers of section 1983 were concerned. That code permitted and condoned police misconduct as surely as a written rule expressly immunizing officers from any inquiry into acts of violence. If Memphis had any nominal rule forbidding police violence, it was little more than a dead letter. The police officers who knew of the mistreatment of civilians uniformly suppressed that information, and their supervisors, although well aware that criminal conduct was being concealed in this manner, made no apparent effort to impose sanctions on any of the officers involved in the cover-up.

In sum, the Court holds that plaintiffs' constitutional injuries were sustained as a direct result of municipal policies and customs within the meaning of *Monell.* Indeed, the facts of record reflect an unconstitutional "official policy" in the sense in which that term "often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."

That was the view of agency law which prevailed in 1871. See J. STORY, COMMENTARIES ON THE LAW OF AGENCY ¶ 87 (1839) (authority of agent can arise "by implication by numerous acts, done by the agent with the tacit consent or acquiescence of the principal.").

**28.** Cong. Globe, 42nd Cong., 1st Sess. 78 (1871) (Rep. Perry).

**29.** *See* RESTATEMENT OF THE LAW OF AGENCY (Second) § 43 (1958). Comment (a) notes, "Persons ordinarily express dissent to acts done on their behalf which they have not authorized or of which they do not approve."

*Pembaur,* —— U.S. at ——, 106 S.Ct. at 1299. The Director of Police is therefore liable to plaintiffs in his official capacity, the damages to be paid by the City of Memphis.

## DAMAGES

As previously noted, the Court of Appeals reversed this Court's damage award and remanded the case for the Court to recompute damages, taking into account the nature of plaintiffs' substantive constitutional rights which were violated, i.e., "the nature of the wrong." The Court of Appeals remand instructions must be carried out in light of the recent decision in *Memphis Community School Dist. v. Stachura,* —— U.S. ——, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), in which a unanimous Supreme Court held that compensatory damages in § 1983 cases cannot permissibly be based on the abstract value or importance of substantive constitutional rights. The Supreme Court appears, moreover, to have disapproved of the Eighth and Tenth Circuit decisions relied upon by the Court of Appeals in this case. *See id.* at —— nn. 5 & 6, 106 S.Ct. at 2541–42 nn. 5 & 6. Nonetheless, the *Stachura* decision serves to underscore the need to provide fully compensatory damages for the violation of substantive constitutional rights, *see also id.* at ——, 106 S.Ct. at 2546–48 (Marshall, J., concurring), and, upon reflection, the Court has concluded that the compensatory damage award recommended by the Magistrate is not fully compensatory and is therefore inadequate.

This Court made the following findings as to the nature of the injuries sustained by plaintiffs (516 F.Supp. at 1357–58):

Miss Brandon was treated in the emergency room for facial cuts caused by the shattered glass. Later, a bullet fragment was removed from her face. Mr. Muse underwent three hours of plastic surgery and was hospitalized for two days. He was required to return to his physician periodically for additional treatment. Mr. Muse still has scars on his face.

Both plaintiffs have suffered great physical pain and anguish as a result of the incident. Miss Brandon testified that she has experienced nightmares, headaches, irritability, impatience, withdrawal, fear, and emotional distress. Mr. Muse testified that he has had difficulty sleeping since the incident. He has suffered fear and emotional distress. He sustained damage to his car. Both plaintiffs testified they have lost respect for the police. Their senior year in high school was disrupted by the incident. There is evidence that plaintiffs are likely to bear some emotional scars from this experience for the remainder of their lives.

*See also* Report and Recommendation of the Magistrate at 5–6:

The actual physical damages to Brandon would appear on the surface to be minor. She received minor lacerations to her face as the result of the windshield shattering, when Allen fired a shot at the vehicle being driven by Muse (Trial Transcript at 15). It was further determined that a splinter of the bullet lodged in her cheek, and was removed by her father with tweezers a few days later (16). Brandon was treated at the emergency room and required no further treatment (15).

However, Brandon was obviously terrified when she saw Muse, bleeding seriously, and claiming that he was "hurt real bad" attempting to outrun the enraged Allen in a wild vehicle chase to the hospital. She also indicated that, since that time, she has become afraid and cringes when she sees a policeman or police car. This incident disrupted her senior year in high school. Her parents had to escort her on dates because of her fear Allen might finish what he started to do (Transcript, 18–19).

The injuries of plaintiff Muse are considerably more serious than those of plaintiff Brandon. Allen maliciously, and without provocation, struck Muse in the neck and head with his fist, and then stabbed and cut Muse on the left side of the neck, and on the right side of the

head. The cutting on the left side of the neck was dangerously close to the jugular vein, and caused a laceration of some 8 to 10 inches (Trial Transcript at p. 30–33). As a result of this cut, "a fountain of blood" errupted (Transcript at 24). Muse had to be kept awake during his time at the hospital to be sure that the artery or vein in his neck had not been so damaged, as to cause the blood supply to the brain to be cut off (Transcript at 51). This wound was reconstructed by Dr. Asghar Koleyni, a plastic surgeon. However, the injury left a scar on the neck of Muse, which is permanent (Deposition of Dr. Koleyni, at page 12).

As mentioned, Muse was also seriously cut on his right ear, with the cut extending down to his right cheek. The right ear was cut through and through (Dr. Koleyni, page 6). While the injury was repaired by Dr. Koleyni, there will be a permanent scar on his ear, as well as a slight deformity (Deposition of Dr. Koleyni, at page 12). Muse also received a small laceration on the right side of his temple, near the hair line.

Muse was immediately aware of the seriousness of his wound, since he told Ms. Brandon, his date, that he was "hurt real bad" (Transcript of Trial, at pages 8 and 9). Nonetheless, he was concerned for his further well being and the well being of Ms. Brandon, to the extent that he forced himself to get into his automobile and drive to the nearest hospital. In doing so, he had to undergo a harrowing experience, trying to outrun defendant Allen, and being bumped by Allen's vehicle in the process. The fear and emotional distress during this period is self-evident.

The evidence produced at the trial indicates that Muse suffered embarrassment thereafter and has developed a bad attitude toward police officers (Transcript at page 30).

Despite these findings, the Magistrate recommended that only $5,000 in compensatory damages should be awarded to Brandon, and only $21,310.75 to Muse ($1,310.75 in out-of-pocket expenses and

$20,000 for physical injuries, pain and suffering, and emotional and psychic trauma). As previously indicated these amounts presently appear inadequate to fulfill Section 1983's purpose of providing fully compensatory justice and of compensating plaintiffs for the unconstitutional brutalization and terrorization visited upon them. While the Magistrate did not reveal how he arrived at these amounts, the Court notes that the amounts fall within the ranges of compensation suggested to the Magistrate by the Director ($1,000 to $4,000 for Brandon) ($5,000 to $26,000 for Muse). *See* Brief of Defendant E. Winslow Chapman on Issue of Damages (17 Dec.1981). The Court further notes that most of the cases listed by the Director in support of his suggested damage award are from the 1960's and early 1970's. Inflation alone would have more than doubled those awards by the time of the trial in this case. Plaintiffs, furthermore, cited several cases in which substantially greater damages were awarded for seemingly less serious injuries than those suffered by plaintiffs. *See* Plaintiffs' Reply Brief for Award of Compensatory and Punitive Damages.

Taking into account fully the nature of the plaintiffs' injuries and § 1983's requirement for complete compensation, the Court concludes that at least twice the amount of damages recommended by the Magistrate is appropriate. The Court therefore awards compensatory damages in the amount of $10,000 to plaintiff Brandon and $41,310.75 to plaintiff Muse, jointly and severally against defendant Holt in his official capacity (to be paid by the City) and defendant Allen in his personal capacity. The Magistrate's recommendation of an award of $25,000 in punitive damages to each plaintiff against defendant Allen in his personal capacity is approved and confirmed. Plaintiffs are entitled to interest on the damage amounts initially recommended by the Magistrate at the Treasury bill rate in effect immediately prior to the date of the Magistrate's Report (8 February 1982), such interest to run from that date until paid. 28 U.S.C. § 1961. And, of

course, interest shall run on the additional damages awarded herein from the date of this decision until paid.

## COSTS AND ATTORNEYS' FEES

Plaintiffs have applied for an award to their counsel of litigation costs and expenses and reasonable attorneys' fees. Plaintiffs are the prevailing party in this action and are therefore entitled to such an award under the mandate of 42 U.S.C. § 1988.

Plaintiffs' counsel have documented the expenditure of costs and litigation expenses in the amount of $5,876.23. These expenditures are in order and are therefore approved.

Plaintiffs' counsel, by their affidavits, have itemized the following amounts of time expended in this litigation and have claimed the following rates as reflecting the fair market value of their services:

| Attorney | Hours Expended | Hourly Rate | Lodestar Fee |
| --- | --- | --- | --- |
| Sorak | 44.7 | $100 | $ 4,470.00 |
| Arnold | 88.78 | $100 | $ 8,878.00 |
| McKanna | 254.00 | $115 | $29,210.00 |
| Schnapper | 158.8 | $250 | $39,700.00 |
| Caldwell | 71.5 | $150 | $10,725.00 |
| TOTAL | | | $92,983.00 |

The Court has reviewed the itemizations of services set forth in the affidavits of counsel and finds them to be thorough, reasonable and necessary to the successful prosecution of this prolonged action. Plaintiffs prevailed in this case in all material respects, and their counsel are therefore due to receive a fully compensatory fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Court has also examined the hourly rates requested by plaintiffs' counsel in light of their relevant skills, qualifications, and experiences, and finds that those rates reflect the reasonable market value of the services. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Kelley v. Metropolitan County Board of Educ.*, 773 F.2d 677 (6th Cir.1985) (*en banc*), *cert. denied*, —— U.S. ——, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986). Plaintiffs have been represented by highly skilled civil rights lawyers, some of whom possessed expertise in Section 1983 litigation, in addition to expertise in the particular issues on which this case turned in the Court of Appeals and the Supreme Court.

Plaintiffs have also requested that the lodestar fee obtained by multiplying the hours of services by the hourly rates of counsel should be enhanced by an upward adjustment of 100% to account for the "contingency factor" in establishing official-capacity municipal liability, i.e., to reflect the risk that plaintiffs would not have secured a recoverable judgment, and hence attorneys' fees had they not prevailed on their municipal liability claim against the Director in his official capacity—a claim that had to be litigated all the way to the Supreme Court. The Court notes that further guidance on the question of a contingency enhancement may be provided by the Supreme Court next term when that issue is reargued in *Pennsylvania v. Delaware Valley Citizens Council*, —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). *See id.* at ——, 106 S.Ct. 3099–3100; —— U.S. ——, 106 S.Ct. 3331, 92 L.Ed.2d 737 (1986) (restoring issue to the calendar for reargument).

Nevertheless, the law in the Sixth Circuit is consistent and continues to authorize upward adjustments to account for the contingency factor. *Kelly v. Metropolitan County Board of Educ., supra.* This case further is certainly a proper case for such enhancement, for reasons that are self-evident from the history of the case. In view of the parsimony which usually attends such enhancements in civil rights cases, however, the Court concludes that it is the better part of discretion to limit the upward adjustment in this case to 25%, the percentage recently approved by the *en banc* Sixth Circuit in *Kelley, supra. See also, e.g., Louisville Black Police Officers Org., Inc. v. City of Louisville*, 700 F.2d 268 (6th Cir.1983) (upward adjustment by 33.33% contingency factor); *Webb v. County Bd. of Educ. of Dyer County*, No. C–79–2574 (W.D.Tenn. 10 Feb.1982) (25% contingency

factor), *aff'd on other grounds*, 715 F.2d 254 (6th Cir.1983), *aff'd*, 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985).

█ Finally, the Court observes that the fee award approved above exceeds the amount of damages awarded to plaintiffs. This is not surprising, given the extensive appellate litigation which ensued following this Court's initial judgment. The City, of course, had the right to appeal the official-capacity issue, but it must be presumed to have done so with the understanding that liability for additional attorneys' fees for plaintiffs' counsel would result if the City failed to prevail on appeal. In any event, the Supreme Court has just recently held that "Congress recognized that reasonable attorney's fees under § 1988 are not conditioned upon and need not be proportionate to an award of money damages," *City of Riverside v. Rivera*, —— U.S. ——, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986), and that "[i]n order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case." *Id.* The plaintiffs here, who were wholly successful on all of their claims (except for an insignificant amount of time related to the Mayor, who was dismissed from the case early on), are in a much stronger position to claim a fully compensatory fee than were the plaintiffs in *Riverside*.

Accordingly, the Court shall award plaintiffs full compensation for all time their counsel reasonably expended on this case. The award thus includes the lodestar amount of as set forth in the table above, plus a contingency factor of 25% ($23,245.75), for a total fee award of $116,228.75; and an award of $5,876.23 in costs and litigation expenses. Interest shall run at the legal rate until this award is paid. 28 U.S.C. § 1961.

It is therefore, by the Court, Ordered that:

1) Plaintiff Elizabeth Brandon is hereby awarded compensatory damages in the amount of $10,000 and plaintiff James Sherman Muse is hereby awarded compensatory damages in the amount of $41,310.75 jointly and severally against the defendant, John D. Holt, in his official capacity, to be paid by the City of Memphis, Tennessee, and defendant Robert J. Allen in his personal capacity.

2) Plaintiffs are also awarded attorney's fees in the amount of $116,278.75 and costs in the amount of $5,876.23, against the same defendants in their capacities as set forth in item # 1 above.

3) Plaintiffs are further awarded $25,000.00 punitive damages, to each plaintiff, against the defendant, Robert J. Allen.

4) Plaintiffs are also awarded interest on their money judgments as of May 5, 1982, at the Treasury Bill rate then prevailing and upon the additional damages from the date of this decision until paid.