Calvin McLIN, By and Through his guardians and next of kin Reverend and Mrs. HARVEY; and Joseph Weaver, By and Through his guardian and next of kin Dorothy Reese, Plaintiffs,

v.

CITY OF CHICAGO; Leroy Martin, Superintendent of Police; David Fogel, Administrator, Office of Professional Standards; Kathleen Moore, Chicago Police Officer; James Serio, Chicago Police Officer; Patrick Fitzpatrick; Joseph Johnston; Dan Beyer; Bobby Campbell; James D. McKeowan; David Cobb; John Boyd; Salvador Noceda; and Rigoberto Barajas, Defendants.

No. 89 C 9253.

United States District Court,
N.D. Illinois, E.D.

July 18, 1990.

Peter J. Schmiedel, People's Law Office, Chicago, Ill., for plaintiffs.

John F. McGuire, Sharon Baldwin, Justin P. Erbacci, Asst. Corp. Counsel, Kelly R. Welsh, Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Plaintiffs Calvin McLin and Joseph Weaver, both of whom are young black

men, allege that they were waiting for a bus when two white members of the Chicago Police Department ordered them into a squad car, drove them around, verbally abused them, and ultimately dropped them off in a neighborhood which the officers knew to be hostile and dangerous for blacks. As a result, McLin and Weaver were allegedly assaulted by a group of white and hispanic civilians. Plaintiffs have now filed this civil rights lawsuit against the white and hispanic civilians; the individual police officers allegedly involved in the incident; Leroy Martin, the Superintendent of Police; David Fogel, the Administrator of the Office of Professional Standards ("OPS") of the Chicago Police Department (the "Department"); and the City of Chicago (the "City"). Pending is a motion to dismiss filed by Martin, Fogel and the City. For the reasons stated below, the motion is granted as to Martin and Fogel but denied as to the City.

## II. FACTS

In ruling on defendants'[1] motion to dismiss, the Court accepts as true the factual allegations of the complaint. Plaintiffs are young black men of fourteen years of age. On the evening of August 15, 1989, plaintiffs were standing in Chicago in the vicinity of Comiskey Park, waiting for a bus to take them home from a Chicago White Sox baseball game. At about 10:00 p.m., they were approached by white Chicago police officers Kathleen Moore and James Serio. Moore and Serio beckoned to plaintiffs in a demeaning and derogatory manner. Moore and Serio then ordered plaintiffs into their squad car and drove them around while interrogating them. Plaintiffs informed Moore and Serio of their ages and addresses, that they had no prior criminal records, and that they were on their way home from a Chicago White Sox baseball game. While Moore and Serio drove plaintiffs around, they mocked plaintiffs' voices in a demeaning and racially derogatory manner and

made racial slurs. Moore, for instance, asked plaintiffs if they had ever had their "ass kicked by a big fat white woman."

Moore and Serio agreed with each other to drop plaintiffs off in a racially hostile area. They then drove plaintiffs to 45th Avenue and Union Avenue, near the Graham School, more than two miles from plaintiffs' homes. Moore and Serio knew that this neighborhood was hostile and dangerous to blacks and that the Graham School was a gathering place for white youths who would attack blacks who entered the neighborhood. Moore and Serio never told plaintiffs where they were or why they were being dropped off in that location.

Moore, at Serio's request, opened the back door of the squad car, struck McLin in the face, and struck Weaver in the neck. The squad car pulled away, and plaintiffs began to walk south on Union Avenue. Plaintiffs were then attacked by white and hispanic youths, who chased plaintiffs while throwing bottles and other objects at them. Plaintiffs began to run, and they were chased by youths who called them "niggers" and other racially derogatory names. The youths threw bottles, sticks and other objects at plaintiffs and sought to catch plaintiffs in order to injure them.

The youths chased plaintiffs to 47th Street and Union Avenue, where they caught McLin. They beat and kicked McLin until he was unconscious. The youths continued to chase Weaver east on 47th Street, throwing objects at him and calling him racially abusive names. Some of the objects struck Weaver, who also fell and injured himself. Weaver continued running for many blocks and eventually eluded his pursuers.

Plaintiffs allege that Moore and Serio were aware of the youths' actions and refused to stop them or to come to plaintiffs' aid.

---

1. Although only three of the fourteen defendants—Martin, Fogel, and the City—have joined in the pending motion to dismiss, the Court shall use "defendants" to refer solely to the moving defendants. Similarly, although the adult guardians of McLin and Weaver are named as additional plaintiffs, the Court shall use "plaintiffs" to refer solely to McLin and Weaver.

Count I of plaintiffs' complaint alleges that Moore and Serio are liable pursuant to 42 U.S.C. § 1983 for violating plaintiffs' civil rights. Count II alleges that Moore and Serio are liable under 42 U.S.C. §§ 1983 and 1985(3) for conspiring to violate plaintiffs' civil rights. Count III alleges that Moore, Serio and the civilian defendants are liable under 42 U.S.C. §§ 1983 and 1985(3) for conspiring to violate plaintiffs' civil rights. Count IV alleges that the civilian defendants are liable pursuant to 42 U.S.C. § 1985(3) for conspiring to violate plaintiffs' civil rights. Count V alleges that Moore and Serio are liable pursuant to 42 U.S.C. § 1986 for failing to prevent the conspiracy referred to in Count IV. Count VI alleges that the City is liable for its failure to discipline police officers. Count VII alleges that the City is liable for a practice and policy of a "code of silence" which contributes to unlawful police practices. Count VIII is a state law claim for assault, battery, intentional infliction of emotional distress, and conspiracy. Count IX is a state law claim for ethnic intimidation. Count X alleges that the City is liable for the actions of Moore and Serio which violate state law under a theory of *respondeat superior.*

## III. INDIVIDUAL DEFENDANTS

■ The complaint does not specify whether Martin and Fogel are sued in their official or their individual capacities. Defendants argue that to the extent Martin and Fogel are named in their individual capacities, they should be dismissed because the complaint does not allege that they had immediate supervisory authority over Moore and Serio or that they had any power to direct the actions of Moore and Serio. Accordingly, defendants argue, plaintiff has not alleged the personal involvement necessary to hold Martin and Fogel liable as individuals. *See Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir. 1986); *Schultz v. Baumgart,* 738 F.2d 231, 238–39 (7th Cir.1984). In their response brief, plaintiffs appear to concede this point, arguing only that the lawsuit may proceed against Martin and Fogel in their

official capacities. (Mem. in Response at 14.)

Defendants further argue that naming Martin and Fogel in their official capacities is improper. A suit against city officials in their official capacities is in reality a suit against the city. *See Kentucky v. Graham,* 473 U.S. 159, 167, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Henry v. Farmer City State Bank,* 808 F.2d 1228, 1238 (7th Cir.1986); *Williams v. City of Chicago,* 658 F.Supp. 147, 153 (N.D.Ill. 1987). Because the City is already named as a defendant, defendants argue that the presence of Martin and Fogel as defendants in their official capacities would be superfluous. The Court agrees. As one court has stated, where "no claim against officials in their individual capacities was made, a simpler, technically correct and by far preferable structuring would have been to name the City as the sole defendant." *Spell v. McDaniel,* 824 F.2d 1380, 1396 (4th Cir.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). Because the City is already a defendant, dismissing Martin and Fogel does not prejudice plaintiffs, and it clarifies and streamlines the pleadings. Accordingly, Martin and Fogel shall be dismissed from the case.

## IV. CITY OF CHICAGO

■ The City is liable for the acts of its employees pursuant to 42 U.S.C. § 1983 only if execution of the City's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The City moves to dismiss Counts V and VI on the ground that plaintiffs have not alleged sufficient facts to support their allegation that their injuries were caused by a policy or custom of the City.

### A. Policy or Custom

■ An express City policy need not be alleged in order for plaintiffs to state a claim which is consistent with *Monell.* In certain circumstances, a pattern of conduct

by non-policy-making municipal employees may rise to the level of a city policy, custom or usage which is sufficient to give rise to municipal liability.

To hold a city liable in such circumstances, the plaintiff must first show a pattern of conduct. A single incident of unconstitutional behavior by a municipal employee is insufficient to hold the city liable. *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). Where the pattern of conduct is sufficiently widespread in terms of duration and/or frequency, it may give rise to an inference of actual or constructive knowledge on the part of the city. *See Spell, supra,* 824 F.2d at 1387; *Williams v. City of Chicago,* 658 F.Supp. 147, 152 (N.D.Ill.1987). When the city, possessing such knowledge, fails to act to curb the conduct, the pattern of conduct may be considered a policy or custom attributable to the city if the city's failure to act rises to the level of deliberate indifference to the rights of those who are affected. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989); *Spell,* 824 F.2d at 1391; *Williams,* 658 F.Supp. at 154. Finally, the plaintiff must prove that his injury was caused by the particular policy or custom shown. *See Spell,* 824 F.2d at 1390–91.

A plaintiff who wishes to proceed on such a theory must plead specific facts which go beyond the boilerplate recital of policy allegations. Thus, "the plaintiff must plead some fact or facts tending to support his allegation that a municipal policy exists that could have caused his injury." *Strauss,* 760 F.2d at 769. In this case, defendants argue that plaintiffs' factual allegations in Counts VI and VII are insufficient to permit a finding of policy or custom on the part of the City.[2]

*B. Count VI—Failure to Discipline*

In Count VI, plaintiffs allege that the City, through its police department and policy-making officials, maintains a policy and custom of "failure to properly supervise, discipline, transfer, counsel, or otherwise control police officers engaged in the excessive use of force, including deadly force, particularly those who are repeatedly accused of such acts." (Complaint ¶ 60.) The complaint further alleges that this policy or custom was maintained or implemented with deliberate indifference, and that it was the direct and proximate cause of plaintiffs' injuries because it encouraged defendants to commit the actions complained of against plaintiffs.

In support of this allegation, the complaint alleges the following facts (Complaint ¶¶ 61–64):

1. For the past 15 years, the OPS has received approximately 2,000 to 2,500 excessive force complaints and has sustained and recommended discipline in only five percent of those complaints. Seventy-five to eighty-two percent of the remaining complaints are classified "not sustained" even though, as the Department has admitted, the majority of the complaints have merit.

2. The percentage of excessive force complaints which are sustained is further reduced upon review by the Superintendent of Police and the Police Board.

3. In the few cases where complaints are sustained, the amount of discipline recommended and imposed is, by the Superintendent's admission, grossly inadequate.

4. In most, if not all, of the lawsuits which allege excessive force, deadly force, or other police abuse and which result in verdicts or settlements for the victims, the Department and OPS impose no discipline and almost never reopen the investigation, and sometimes promote the officer involved. In most of these cases, the officers involved are "repeaters" who are subject to numerous complaints of excessive force.

5. After a jury found that the City had a policy and practice of abusing persons

---

**2.** Much of the tenor of both parties' briefs suggests that the parties' dispute is whether plaintiffs have alleged sufficient factual details to prove their case on the merits. It is important to remember that the issue with respect to a motion to dismiss is not whether plaintiffs have proven their case, but rather merely whether they have stated a claim for relief.

suspected of shooting police officers in *Wilson v. City of Chicago,* No. 86 C 2360, no officers were disciplined and no investigation was initiated to discipline those responsible for the policy.

6. Investigations conducted by the OPS are inadequate, with no cognizable standard of proof, and the investigators are inadequately trained and often have connections with law enforcement, including being applicants for employment by the Department.

7. The OPS and Department destroy disciplinary files and records of all excessive force complaints after five years, with the exception of complaints which are sustained. This makes it difficult to identify patterns of brutality, to identify and discipline "repeaters," and to adequately investigate complaints of excessive force.

8. About five years ago, the Department rescinded a general order which had required an officer who had three "sustained" or "not sustained" excessive force complaints within a two-year period to receive psychological counseling. Since then, the Department has rejected for counseling the vast majority of officers which OPS recommends for counseling after an allegation of excessive force.

9. In 1983, television station WMAQ–TV broadcast a series which identified numerous police officers as "repeaters" who had up to 30 complaints of excessive force lodged against them. None of those officers were disciplined, nor was any investigation initiated, as a result of that series.

10. Although the "repeaters" have been identified by the Department and OPS, nothing has been done to address the problem of "repeaters," the "repeaters" remain on the force, and the practices and procedures of the Department and OPS protect the repeaters.

11. For many years, officers of the Department have maintained a custom and practice of taking youths—particularly black youths—from one neighborhood and dropping them off in a different, hostile neighborhood, thereby placing the youths at risk of physical attack.

12. Martin, Fogel and other high supervisory officials of the Department have knowledge of the "drop off" custom described in Paragraph 11 but have failed to discipline officers who engage in this activity, thereby encouraging the practice.

13. Defendant Serio has had previous complaints of racially motivated police misconduct lodged against him, but he has never been properly disciplined, counseled, controlled or supervised.

Defendants raise several arguments in support of their contention that Count VI pleads insufficient facts to state a claim for municipal liability. First, they point out that "the number of complaints filed, without more, indicates nothing." *Strauss,* 760 F.2d at 769. After all, "[p]eople may file a complaint for many reasons, or for no reason at all." *Id.* In this case, however, plaintiffs have not simply relied on "the number of complaints filed, without more." They have pleaded the "more" that is necessary—they allege that the complaints have been inadequately investigated and have generally been classified "not sustained" even though the majority are allegedly meritorious. They have also described a number of other activities which, together with the treatment of complaints, allegedly encourage police misconduct. *See Williams,* 658 F.Supp. at 154–55 (denying motion to dismiss failure to discipline count emphasizing number of complaints against officer because "unlike the numbers in *Strauss,* these numbers, with more, could mean something"). In light of the significant other allegations of Count VI, the Court cannot find that the number of complaints filed is irrelevant.[3]

**3.** In their response memorandum, plaintiffs cite additional evidence, namely an audit of OPS conducted by the Department's Internal Affairs Division as reported in the *Chicago Sun–Times* after the complaint was filed, which supports their contentions that investigative procedures are inadequate and that many meritorious complaints are not sustained. Because the complaint is sufficient on its own, the Court does not decide whether consideration of that evidence is appropriate for the motion to dismiss.

Defendants next argue that plaintiffs allegations concerning "repeaters" are insufficient. Defendants contend that in order for the allegations to be upheld, they must include allegations that the complaints actually involved illegal activity by the officers, that similar illegal activity was involved in this case, and that there was an affirmative link between plaintiffs' injuries and the failure to discipline. Allegations that the complaints were meritorious and that the illegal activities were similar in nature are not necessary. If the complaints were routinely ignored, that could lead to a belief on the part of the officers that they could abuse citizens with impunity, even if the complaints were often meritless and even if the complaints concerned different kinds of abuse. Plaintiffs allegations are also sufficient to show a link between the failure to discipline and their injuries. The complaint expressly alleges causation, and that allegation is sufficient in light of the factual allegations concerning an extensive failure to discipline which has the effect of encouraging abusive behavior by officers.

Defendants also contend that plaintiffs have failed to allege facts indicating that Moore and Serio were "repeaters" or that they, in particular, had previously dropped off youths in hostile neighborhoods. However, no such allegations are necessary.

Certainly such showings would strengthen plaintiffs' causation argument. However, if the City, by its inaction in the face of constructive knowledge of the abuses alleged by plaintiffs, had a policy or custom which encouraged drop-offs and other police misconduct, that policy or custom could certainly result in such behavior even by officers with a previously unblemished record.

Finally, defendants argue that plaintiffs' factual allegations are conclusory. For example, plaintiffs allege that officers have customarily dropped off youths in hostile neighborhoods, but they do not describe specific drop off incidents. To accept defendants' argument, however, would be to impose an impossible burden on plaintiffs. As *Strauss* pointed out, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." 760 F.2d at 767. Furthermore, identifying particular "facts is of course more difficult when the policy through which plaintiff is aggrieved is one of acquiescence by the City in prior misconduct, thus encouraging the misconduct to continue, than when the policy is an affirmative one through which the City has acted to harm the plaintiff." *Id.* at 769. Plaintiffs need not describe all of their evidence in the complaint. Lack of detail concerning the drop-off custom alleged in the complaint is not fatal.[4]

**4.** The *Strauss* opinion has not been entirely welcomed by the judges of this Court. For instance, in *Payne v. City of LaSalle*, 610 F.Supp. 606 (N.D.Ill.1985) (Shadur, J.), the court complained that "to require evidentiary *pleading* of the facts demonstrating a city's pattern of knowing acquiescence in police misconduct creates a Catch 22 situation," because the victim may be unable to allege detailed facts prior to discovery. 610 F.Supp. at 607 (emphasis in original). The court stated that *Strauss* "appears to create a real double standard—one in which a Section 1983 complaint must meet a more stringent fact-pleading requirement than in any other." *Id.* at 608. The court expressed its belief that *Strauss* was therefore inconsistent with *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and Fed.R.Civ.P. 8(a)(2). *Id. See also East v. City of Chicago*, 719 F.Supp. 683, 692 n. 12 (N.D.Ill.1989) (Shadur, J.).

In *Rosentreter v. Munding*, 736 F.Supp. 165 (N.D.Ill.1990) (Aspen, J.), the court dismissed,

for failure to "allege specific evidentiary facts," a failure to train claim, but did so "with some reluctance. We believe that *Strauss* places an unrealistic burden on certain plaintiffs who might otherwise possess legitimate claims against municipalities, yet who are foreclosed from an opportunity for recovery because of an understandable inability to meet the strict terms of *Strauss.*" 736 F.Supp. at 168. Accordingly, the court believed, "it is likely that for many legitimate claimants, *Strauss* has barred entry [to the courtroom] altogether—and without any significant benefit." 736 F.Supp. at 170.

As summarized in *Rosentreter,* courts have sought ways to avoid the limitations imposed by *Strauss.* Thus in *Johnson v. City of Chicago,* 711 F.Supp. 1465 (N.D.Ill.1989) (Moran, J.), the court suggested that because of the difficulties in satisfying *Strauss*'s mandate, a plaintiff may be entitled to some limited discovery in order to fulfill pleading requirements. 711 F.Supp. at 1473 n. 5. In *East, supra,* the court suggested that where claims against individual officers survive, discovery may justify reinsertion of the

A failure to discipline police officers, resulting in increased abusive behavior by police officers, has been recognized to be a policy for which municipal liability may attach. *See Spell*, 824 F.2d 1380; *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Williams*, 658 F.Supp. at 153–55. The Court finds that plaintiffs' allegations in this case suffice to state a claim against the City for failure to discipline its police officers.

### C. Count VII—Code of Silence

In Count VII, plaintiffs allege that the City and high supervisory police officials, including Martin and Fogel, have been aware of a de facto policy or custom of a police code of silence. Pursuant to this code of silence, police officers refuse to report instances of police brutality and misconduct of which they are aware, and they remain silent or give false and misleading information during investigations in order to protect fellow officers. (Complaint ¶¶ 68, 70.) Plaintiffs allege that the code of silence proximately caused their injuries because "[b]ut for the belief that they would be protected by the silence and complicity of their fellow officers, the officers responsible for the acts alleged in this complaint would not have engaged in the conduct that resulted in the injuries to the Plaintiffs." (Complaint ¶ 74.)

Plaintiffs allege that the code of silence is evidenced by the following (Complaint ¶¶ 69, 71, 72):

1. Martin and Fogel have admitted that such a code of silence exists within the Department.

2. In the case of *Jones v. City of Chicago*, No. 83 C 2360 (N.D.Ill.), *aff'd*, 856 F.2d 985 (7th Cir.1988), a jury found that Department detectives and supervisory personnel had falsely arrested and imprisoned the plaintiff and had maliciously prosecuted him. The only officer ever investigated or disciplined was Frank Laverty, a detective who broke the code of silence and exposed the defendants' behavior.

3. In the case of *Wilson v. City of Chicago*, No. 86 C 2360 (N.D.Ill.), numerous police officers and detectives testified that they had testified hundreds of times in cases where excessive force was alleged and that in none of those cases had they ever admitted to seeing or participating in excessive use of force or

---

municipal defendant at a later time. 719 F.Supp. at 692 n. 12. *See also Payne, supra*, 610 F.Supp. at 609 n. 8. However, as *Rosentreter* points out, 736 F.Supp. at 170, this approach may not be consistent with the opinion in *Strauss*, which expressed a desire to foreclose plaintiffs from filing a complaint with boilerplate allegations of policy and "proceed[ing] to discovery in the hope of turning up some evidence *to support the 'claims' made*." 760 F.2d at 768.

Although this Court shares some of the concerns expressed by its brothers, it does not believe that *Strauss* must be read so broadly as to impinge significantly on those concerns. *Strauss* requires only that sufficient facts be alleged to support the policy or custom allegations of the complaint. It seeks merely to exclude those complaints which include the City as a defendant pursuant only to conclusory, boilerplate allegations. Thus the court stated: "*Nothing* in the complaint suggests that the incident was other than an isolated one unrelated to municipal policy." 760 F.2d at 767 (emphasis added). Similarly: "A complaint that tracks *Monell's* requirement of official policy with *bare allegations* cannot stand when the policy identified is nothing more than acquiescence in

prior misconduct. The absence of *any facts at all* to support plaintiff's claim renders the allegations *mere legal conclusions* of Section 1983 liability devoid of well-pleaded facts." *Id.* at 767 (emphasis added). Again: "Without *some evidence* apart from the fact of employment, *regardless how slight*, that a policy causing plaintiff's injury might exist, the plaintiff simply cannot proceed in court against the municipality." *Id.* at 768 (emphasis added). Yet again: "We do not mean to imply that a plaintiff must plead in greater detail, but merely that the plaintiff must plead *some fact or facts* tending to support his allegation that a municipal policy exists that could have caused his injury." *Id.* at 769 (emphasis added). *Strauss* expressly recognized that the complaint's factual allegations need not be detailed, 760 F.2d at 767, 769, and that identifying facts prior to discovery may be difficult where City acquiescence is alleged, 760 F.2d at 769.

In any event—whether *Strauss* be read narrowly or more broadly—the factual allegations in this case, which include specific, if not detailed, facts supporting the policy or custom claims, are more than sufficient to satisfy the requirements described in *Strauss*.

other police misconduct. They further testified that the only officer who they had heard of having done so was Frank Laverty.

4. Police officials routinely make public statements in high profile excessive and deadly force cases, in which they falsely exonerate the police officer before the completion of the investigation. Plaintiffs cite two specific examples of such alleged statements.

5. The record in the case of *Falk v. McNamara*, No. 88 C 7293 indicates that unidentified officers who participated in the infliction of excessive force are protected by the identified officers and other members of the Department, who conceal the identities of the unidentified officers and destroy documents which would place them at the scene. The record further indicates that the Department and OPS fail to perform a basic and timely investigation when identification could be accomplished through documents and pictures.

6. When plaintiffs and their families first reported the facts which gave rise to this case to supervisory officials at the Department's Ninth District, those officials told plaintiffs that they should keep the incident quiet. Other Ninth District officers, through their silence and other actions, have attempted to protect the responsible officers from detection and punishment.

7. While Martin and Fogel have publicly acknowledged the existence of a police code of silence, Fogel almost never recommends, and Martin almost never approves, discipline of officers charged with excessive force in instances where a civilian victim's version of an act of police misconduct is denied by an accused officer and that officer's partner, or where other police personnel do not contradict the accused officer's denial of the misconduct.

■ Defendants argue that plaintiffs fail to allege sufficient facts concerning the code of silence to support a finding a policy or custom by the City. First, defendants contend that plaintiffs allege no facts which indicate that the code of silence is a custom or policy of the City. However, plaintiffs have alleged sufficient facts to show that the code of silence is widespread and that policy-making individuals knew of the code of silence but failed to take steps to eliminate it. Those allegations are sufficient to state a claim against the City for a policy or custom.

■ Defendants next argue that plaintiffs have failed to show how the code of silence hindered any of plaintiffs' rights or to show any affirmative link to their injuries. Of course, plaintiffs need not "show" anything in the complaint. More importantly, plaintiffs clearly allege that the code of silence encourages abusive behavior by officers because the officers know they are less likely to be disciplined, and that the abusive behavior which is thus encouraged includes the actions at issue in this case. These allegations concerning the causation of plaintiffs' injuries by the code of silence are sufficient.

■ Finally, defendants argue that plaintiffs fail to allege facts indicating that the City acted with deliberate indifference. Plaintiffs' allegations that policy-making officials knew of the code of silence and failed to act are sufficient to support the complaint's allegation of deliberate indifference. As the Court recognized in *Harris, supra,* a need for action on the part of a municipality may "be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 109 S.Ct. at 1205 n. 10. Where the deliberate indifference causes a failure to act, it is difficult to imagine what further, specific facts a plaintiff, prior to discovery, could be expected to plead. As noted above, the complaint need not detail all of the plaintiffs' evidence, but must merely contain enough allegations to state a claim. That standard has been met here.

The Court finds that plaintiffs' allegations concerning a code of silence properly state a claim under 42 U.S.C. § 1983. *Cf. Brandon v. Allen,* 645 F.Supp. 1261 (W.D. Tenn.1986) (finding city liable for code of silence which contributed to abusive behav-

ior by police officer).[5] *See also Spell*, 824 F.2d at 1393 (testimony concerning code of silence supported showing of atmosphere in which excessive force was encouraged); *Williams*, 658 F.Supp. at 149–50 (denying motion to dismiss where plaintiff's theory centered around allegations that "a customary 'code of silence' exists through which officers 'cover up' for each other to deflect investigations of incidents of violence by the Department's Office of Professional Standards, and that supervisory personnel know of and tacitly encourage this practice").

## V. CONCLUSION

For the reasons stated above, defendants' motion to dismiss is granted as to defendants Martin and Fogel and denied with respect to the City of Chicago.

---

**5.** In *Brandon* (on remand from the decision in *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)), the court described the code of silence as follows: "[T]here was throughout the Department a code of silence binding patrolmen and supervisors alike not to testify against or report on their colleagues. That code was enforced by peer pressure, and tacitly sanctioned by the refusal of the Department to impose on its employees any obligation to disclose, even under questioning, misconduct by their fellow officers." 645 F.Supp. at 1266–67. In finding that the code of silence met the "custom" standard of *Monell*, the court stated: "That code permitted and condoned police misconduct as surely as a written rule expressly immunizing officers from any inquiry into acts of violence.... The police officers who knew of the mistreatment of civilians uniformly suppressed that information, and their supervisors, although well aware that criminal conduct was being concealed in this manner, made no apparent effort to impose sanctions on any of the officers involved in the cover-up. In sum, the Court holds that plaintiffs' constitutional injuries were sustained as a direct result of municipal policies and customs within the meaning of *Monell*."