**Callie BRYANT, et al., Plaintiffs,**

v.

**William WHALEN, et al., Defendants.**

**No. 88 C 4834.**

United States District Court,
N.D. Illinois, E.D.

Jan. 18, 1991.

Robert M. Hodge, Chicago, Ill., for plaintiffs.

Douglas McMillan, Sharon Baldwin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

On January 18, 1991, Magistrate Judge Edward A. Bobrick filed and served upon the parties his Report and Recommendation concerning certain motions by the defendants for partial summary judgment as

to four counts of the complaint. Magistrate Judge Bobrick recommended denial of the motion of individual defendants as to Counts II and IV. The Magistrate further found that the plaintiffs concede, and that the record establishes, that defendants Urbikas and Behnke are entitled to summary judgment on Count I. Finally, the Magistrate found that the City was entitled to summary judgment as to the claim in Count IV that the City maintains a custom or policy, or has shown deliberate indifference in failing to discipline the unconstitutional acts of the defendant police officers.

■ The plaintiffs have objected only to the recommendation that claim against the City be dismissed. The magistrate judge's recommendation rests on the plaintiffs' failure to adduce any evidence in support of its claim of deliberate indifference other than statistics concerning how many times excessive force complaints had not been sustained by the internal investigatory and adjudicatory procedures employed by the City. We agree with the magistrate judge that the fact that a low percentage of cases are ultimately sustained cannot in and itself be read to establish a policy of indifference. Absent some further evidence tending to show that meritorious claims were either being deliberately ignored or perfunctorily dismissed, we do not see how the statistics alone could reasonably support any conclusion by a finder of fact that the City is deliberately indifferent to problem of excessive force by certain of its police officers.

■ In their objections, the plaintiffs have attempted to shore up this deficiency in proof. This effort comes too late and in any event lacks any substantive merit. The plaintiffs' reliance on Judge Rovner's memorandum opinion in *McLin v. City of Chicago,* 742 F.Supp. 994 (N.D.Ill.1990) is resoundingly misplaced. *McLin* does nothing to bolster the plaintiffs' evidentiary shortcomings. *McLin* was a ruling on a motion to dismiss, discussing only allegations in a complaint that had yet to be proved. Yet, plaintiffs' counsel would have us take judicial notice of supposed "evidence" in *McLin* in order to "avoid repetitive and expensive discovery." P.Objs. at 7. The plaintiffs assert that "to ignore this evidence of deficiencies in the City's disciplinary system is unsound." To this we can only respond—what evidence? Plaintiffs' counsel, exhibiting a fundamental misunderstanding of the rules of proof, follows his concession "[a]lthough not alleged in the instant plaintiffs' complaint nor raised in discovery" with the statement "the general allegations in *McLin* are applicable to all excessive force cases on the issue whether there exists a *general* failure-to-discipline policy in the City of Chicago." Plaintiffs' counsel apparently has lost sight of the fact that we are at the proof stage of this proceeding. Mere allegations are not proof.[1]

We are sympathetic with the potential difficulties that plaintiffs face with respect to adducing proof of deliberate indifference, particularly from police officers. But the plaintiffs have failed to support their assertion that obtaining additional evidence of deliberate indifference is impossible or unreasonably costly. Indeed, the plaintiffs themselves have suggested other avenues of discovery beyond officer testimony that might have resulted in useful evidence being obtained. Unfortunately, as the plaintiffs themselves admit, they have done little discovery on the *Monell* claim. Mem. in Opp. at 8. And the time for such discovery is now well past. Thus, we have no way of reliably assessing how difficult the task of discovery truly is in such cases. Moreover, though the cost and complications of investigation and any ensuing "mini-trials" of past police conduct may be "obvious," the plaintiffs have failed to show that such costs are so unreasonable (particularly in light of the potential for recovering such costs under Section 1983) such that plaintiffs alleging deliberate indifference should be entitled essentially to shift the burden of proof on such claims to municipalities to

1. Accordingly we see no merit to plaintiffs' further contention that the Magistrate should have permitted them to amend Count VI of their complaint to add the allegations at issue in *McLin* (though we additionally note that the plaintiffs never moved to amend in any event).

show that meritorious claims are not going unpunished.[2]

After careful *de novo* consideration of the magistrate judge's report and recommendation, and the motions, memoranda, pleadings, and evidence adduced on summary judgment, and the plaintiffs objections thereto, we overrule the objections and adopt Magistrate Judge Bobrick's Report and Recommendation. Accordingly, the motion of the individual defendants for partial summary judgment as to Counts II and IV is denied, Defendants Urbikas and Behnke are granted summary judgment as to Count I, and the City is granted summary judgment as to the claim in Count IV that the City maintains a custom or policy, or has shown deliberate indifference in failing to discipline the unconstitutional acts of the defendant police officers.

It is so ordered.

REPORT AND RECOMMENDATION

EDWARD A. BOBRICK, United States Magistrate Judge.

Before the court is the motion of defendants William Whalen, *et al.*, for partial summary judgment as to four counts of the complaint of plaintiff Callie Bryant, *et al.*

The individual defendants in this case, William Whalen, Eldon Urbikas, James Kelly, Steven Schweiger, and John Behnke, are all Chicago police officers. Plaintiffs Cassandra Seay and her children, D'Artagnan Seay, David Seay, and Wenndi Seay are members of a family residing on West Potomac Street in Chicago. Plaintiff Callie Bryant resides on South Parnell Avenue in Chicago, and is Cassandra Seay's mother. This case stems from an encounter between defendant police officers and the family on July 21, 1987. As a result of that encounter, defendant police officers arrested plaintiffs Callie Bryant and Cassandra, D'Artagnan, and David Seay, on various misdemeanor charges. Plaintiffs filed a six-count complaint alleging that the defendant police officers violated their Civil Rights. In addition, plaintiffs named the City of Chicago as a defendant, alleging that the violation of their Civil Rights was a direct and proximate result of the City's unconstitutional policies. The defendant police officers now move for summary judgment on three counts of the complaint, and the City moves for summary judgment on the count in which it is named.

## I. STANDARD FOR SUMMARY JUDGMENT

The party moving for summary judgment bears the burden of establishing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. Any doubt as to whether there is indeed a genuine issue for trial must be resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

If the moving party meets its burden, then the burden shifts to the nonmoving party to present specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986). The nonmoving party is required to "go beyond the pleadings" and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The court must then determine:

2. In *Rosentreter v. Munding,* 736 F.Supp. 165 (N.D.Ill.1990), we were concerned about plaintiffs not being able to gain access to the courts on failure to train or discipline claims prior to having the opportunity to conduct the kind of investigation that only court supervised discovery could provide—though even that concern was not sufficient to overcome the dictates of *Strauss.* Based on the record before us, and particularly in the absence of a diligent undertaking by the plaintiffs, our concern with the difficulty of proof for such claims does not extend to permitting a case to proceed to trial without having taken discovery sufficient to substantiate one's allegations.

> whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. In order for an issue to be genuinely disputed, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510. Thus, this Magistrate Judge must review the record the parties have compiled with these factors in mind in order to determine whether the defendants have established entitlement to summary judgment on any or all of the claims at issue. This Magistrate Judge will first address those claims relating to the individual defendant police officers, and then consider the claim plaintiffs bring against the City.

## II. CLAIMS AGAINST DEFENDANT POLICE OFFICERS

Plaintiffs bring five counts of their six-count complaint against the individual police officers. Plaintiffs bring Counts I through III, sounding in unlawful entry, false arrest, use of excessive force, under 42 U.S.C. § 1983. Counts IV and V are common law claims charging malicious prosecution, and intentional infliction of emotional distress. The defendant police officers have moved for summary judgment as to Counts I, II, and IV—those counts sounding in unlawful entry, false arrest, and malicious prosecution. With respect to Count II, the defendants' motion addresses only those false arrest claims advanced by D'Artagnan Seay; with respect to Count IV, defendants move for summary judgment only as to the claims of D'Artagnan and David Seay.

### A. *Facts*

Many of the details of the encounter between the defendant police officers and plaintiffs are in dispute, making it difficult to fashion a narrative which would accurately represent the flavor of the incident. The parties do seem to agree on a substantial portion of the tale, however, and that portion will provide the basis for the narrative account set forth here. Where details are required for continuity, and the parties' versions of those details diverge, both sides' perspectives will be represented and that divergence will be noted.

Early on the evening of July 21, 1987, fourteen-year-old D'Artagnan Seay was playing football on Kamerling Avenue, approximately one half-block from his home. According to D'Artagnan, he broke the back window of a van parked on the street by accidently striking it with a football. (*See* Defendants' Rule 12(L) Statement, ¶ 1, *citing* D'Artagnan Seay's; Exhibit 1, ("Seay St."), at ls. 3–4). The van owner's son was apparently on the street at the time, and went to get his father, Carl Lee Cross. (*Id.* at ¶ 2, Seay St. at ls. 5–6). Mr. Cross confronted D'Artagnan about the broken window and, during the ensuing discussion, D'Artagnan gave Mr. Cross his home address. (Seay St. at ls. 7–8). D'Artagnan then returned home, and Mr. Cross called the police to report the incident. (Defendants' 12(L) St., at ¶ 2).

At approximately 7:30 p.m. on that evening, defendant police officers Whalen, Urbikas, and Kelly were cruising in the vicinity, and monitored a call of "criminal damage to property" concerning Mr. Cross' van. (Defendants' 12(L) Statement, at ¶ 3). Defendant police officers Schweiger and Behnke also responded to the call. (*Id.* at ¶ 4). All five defendant police officers apparently went to Mr. Cross' home first, and were then directed to D'Artagnan's home. (*Id.* at ¶ 5). When they arrived at the home, Whalen, Kelly, and Schweiger went to the front door, while Urbikas and Behnke covered the back door. (*Id.* at ¶ 6).

As might be expected, it is at this point that the parties' stories begin to differ. It is no surprise that the defendant police officers' version is an attempt to paint a picture of brave knights venturing into hostile territory to perform their sworn duty, only to be met with violent resistance which they overcame with a measured response. It is also no surprise that the plaintiffs depict themselves as a quiet, peace-loving family which was attacked by

a band of stormtroopers without any provocation. Because this portion of the story is in substantial dispute, the parties' statements of facts will be eschewed and the versions will be drawn from their trial briefs.

According to the defendant police officers, Whalen, Kelly and Schweiger rang the front door bell and knocked on the window until D'Artagnan's grandmother, Callie Bryant, answered the door. The defendant police officers informed Bryant that they needed to speak with an occupant of the house about the broken van window. Just then, the defendant police officers were interrupted by Cassandra Seay, D'Artagnan's mother, who demanded to know why the police were at her house. The defendant police officers again explained about the youth and the broken van window. Cassandra Seay responded by saying that she had called the police the night before about a stolen automobile but no one ever came. When the defendant police officers again explained their purpose, Cassandra Seay became abusive and an argument ensued. Cassandra Seay then pushed Whalen in the chest, and Whalen informed her that she was under arrest. At that point Callie Bryant stepped between Whalen and Cassandra Seay. While Schweiger handcuffed Callie Bryant, Whalen and Kelly pursued Cassandra Seay into the house, where she kicked Whalen in the knee. The defendant police officers again told Cassandra Seay she was under arrest and attempted to handcuff her. Cassandra Seay resisted and Whalen and Kelly wrestled her to the floor.

Meanwhile, Urbikas and Behnke, stationed at the back door, heard the struggle inside and broke down the back door to enter the house. When they did, they observed D'Artagnan Seay moving from the rear of the house toward Whalen and Kelly, with a baseball bat raised over his head. Urbikas, with gun drawn,[1] ordered D'Artagnan Seay to drop the bat, to which he complied.[2] David Seay then stepped in between D'Artagnan Seay and the defendant police officers. Finally, Cassandra, D'Artagnan, and David Seay were all handcuffed. As a result of the skirmish, Whalen's leg was bruised and his hand was cut; Kelly's hand was also cut.

The defendant police officers then transported the arrestees to the 25th District Police Station for processing, stopping once to confirm information at the house of Mr. Cross. When asked where she worked, Callie Bryant said "at OPS"—the Office of Professional Standards. When a check revealed she did not work there, she was charged with false impersonation. Following a trip to the washroom, Cassandra Seay complained of bleeding from her vaginal area, and she was taken to John F. Kennedy Hospital. She was treated and released, but she later returned and checked herself into the hospital.

Now for the plaintiffs' version: it was indeed Callie Bryant who answered the door when the defendant police officers rang the bell. At that same time, Cassandra Seay was returning home from her job as a CTA bus driver, and David Seay was returning home from his job as a lab technician. The defendant police officers told Callie Bryant and Cassandra Seay that they were looking for "Kenny"—D'Artagnan was called "Tanny"—in connection with a broken van window. Cassandra Seay said she knew nothing about the incident and asked that the defendant police officers produce a warrant before she allowed them into her home. Whalen then became abusive, and told Cassandra Seay that she had no rights. At this point Callie Bryant stepped between Cassandra Seay and the defendant police officers, and further verbal exchanges ensued. Eventually, Whalen became frustrated, hit Cassandra Seay in the face, and pushed Callie Bryant over to Schweiger, who then handcuffed

1. While defendants' trial brief makes no mention of Urbikas' gun, their answers to plaintiffs' complaint all indicate that Urbikas' gun was drawn.

2. Curiously, when charging D'Artagnan, the defendant police officers claimed that he struck Kelly in the chest with the bat. (*See,* D'Artagnan Seay Petition for Adjudication of Wardship, Ex. 5, at 2). Defendants have apparently abandoned that claim.

the woman. As a result of Whalen's blow, Cassandra Seay fell into the house and onto the living room floor. Whalen pursued her into the house, and he was followed by David Seay, who had been talking with a friend across the street when the altercation began. Whalen hit David Seay in the jaw with the back of his hand and ordered him to stand against the wall. Then, with the help of Kelly, who restrained Cassandra Seay, Whalen administered a beating to Cassandra Seay that included repeated kicks to her vaginal area. Cassandra Seay was handcuffed and offered no resistance other than to try to keep her legs together to protect herself.

Upon hearing the commotion inside, Urbikas and Behnke broke down the back door and saw D'Artagnan Seay advancing toward the front of the house with a baseball bat. With his gun drawn, Urbikas said, "Drop the bat, boy," and D'Artagnan Seay complied. At that time, Seay was unaware that the source of the commotion at the front of the house was police officers. He was handcuffed and taken to the living room where, along with David and Wenndi Seay and Callie Bryant, he witnessed the beating of his mother. Cassandra and D'Artagnan Seay were then taken to a police car in front of the house, while David Seay and Callie Bryant were taken to an unmarked car.

On the way to the 25th District Police Station, the two police cars stopped at Kamerling Avenue and Kildare Avenue. The defendant police officers got out of the cars and met briefly. David Seay and Callie Bryant overheard Whalen orchestrating the stories of the defendant police officers. Upon arrival at the station, the defendant police officers race-baited and verbally abused plaintiffs. During processing, when the defendant police officers asked Callie Bryant where she worked, she said "over at UPS." The defendant police officers interpreted this as OPS, the Office of Professional Standards, and charged her with impersonating a police official. In addition, one of the defendant police officers called the CTA to report that Cassandra Seay had been arrested.

Cassandra Seay repeatedly complained that she was bleeding and asked to go to the bathroom. The defendant police officers refused to allow her to go to the bathroom and denied her medical attention until she had been processed and placed in the lock-up for about 30 minutes. After that, they transported her to John F. Kennedy Medical Center. She was diagnosed as suffering from a cerebral concussion, and contusions of the abdomen, trunk, face, extremities, and vaginal area. David and D'Artagnan Seay were kept in custody for two hours before they were released to their aunt, Lanell Daniels. Callie Bryant was kept in custody overnight.

There is no dispute as to what became of the charges against plaintiffs following their arrests. By complaint filed July 23, 1987, Callie Bryant was charged by Schweiger and Whalen with Obstructing a Police Officer, *Ill.Rev.Stat.* ch. 38 ¶ 31-1, and by Whalen with False Impersonation, *Ill.Rev.Stat.* ch. 38 ¶ 17-2(a). Cassandra Seay was charged by Kelly and Whalen with Battery on a Police Officer, *Ill.Rev. Stat.* ch. 38 ¶ 12-3(a), and Resisting a Police Officer, *Ill.Rev.Stat.* ch. 38 ¶ 31-1. D'Artagnan Seay was charged with Criminal Damage to Property, *Ill.Rev.Stat.* ch. 38 ¶ 21-1(1)(a), and Aggravated Assault, *Ill.Rev.Stat.* ch. 38 ¶ 12-2. David Seay was charged with Obstructing a Police Officer, *Ill.Rev.Stat.* ch. 38 ¶ 31-1.

After a bench trial in the Circuit Court of Cook County at which all plaintiffs and defendant police officers testified, Cassandra Seay and Callie Bryant were found not guilty of all charges. D'Artagnan Seay and David Seay moved to have their case removed from the juvenile division. Their motion was granted by order of February 3, 1988, and the State was ordered to begin criminal prosecution. No prosecution has commenced since that date.

B. *Analysis of Claims*

1. *Count I—Unlawful Entry*

■ In Count I of their complaint, plaintiffs allege that Urbikas and Behnke—the defendant police officers who were stationed at the back door—unlawfully entered the Seay home. Plaintiffs now aban-

don this claim, conceding that Urbikas and Behnke did not commit a constitutional violation by breaking into the rear door of the Seay home. Absent consent or exigent circumstances, police officers cannot enter a home without an arrest or search warrant. *Welsh v. Wisconsin,* 466 U.S. 740, 748–749, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984); *Payton v. New York,* 445 U.S. 573, 589–590, 100 S.Ct. 1371, 1374, 63 L.Ed.2d 639 (1980). One such exigent circumstance is the risk of damages to the police or to other persons inside or outside the dwelling. *Minnesota v. Olson,* — U.S. —, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990). In this case, it is undisputed that Urbikas and Behnke entered the Seay home only upon hearing the sounds of the struggle inside. As such, their entry was lawful and not a constitutional violation.[3] In light of these factors, as well as plaintiffs' abandonment of this claim, defendants Urbikas and Behnke are entitled to summary judgment as to Count I.

2. *Count II—False Arrest*

In Count II of their complaint, plaintiffs claim that the defendant police officers arrested them in violation of the Fourth and Fourteenth Amendments' protects against unreasonable seizures. The defendant police officers move for summary judgment only as to that part of the claim relating to the arrest of D'Artagnan Seay. They argue that, insofar as it is undisputed that D'Artagnan Seay broke the van window and later approached Whalen and Kelly wielding a baseball bat, his arrest on charges of criminal damage to property and aggravated assault was based on probable cause.

The existence of probable cause for an arrest is a bar to a Section 1983 claim for unlawful arrest. *Schertz v. Waupaca County,* 875 F.2d 578, 598 (7th Cir. 1989). Probable cause for an arrest exists when, at the moment of the arrest, the "facts and circumstances within the [arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The existence of probable cause in a Section 1983 is generally inappropriate for summary judgment because it is a question of fact. *Schertz,* 875 F.2d at 582, *citing Llaguno v. Mingey,* 763 F.2d 1560, 1565 (7th Cir.1985). Such an issue may be resolved in the context of summary judgment only if, based on the undisputed facts, there is no room for a difference of opinion. *Id.* at 582; *Bryant v. U.S. Treasury Dept., Secret Service,* 903 F.2d 717, 721 (9th Cir.1990). Thus, in this case, this Magistrate Judge must review the undisputed facts underlying D'Artagnan Seay's arrest on the charges of criminal damage to property and aggravated assault.

Under Illinois law, a person commits criminal damage to property when that person "[k]nowingly damages any property of another without his consent ..." *Ill.Rev.Stat.* ch. 38 ¶ 21–1(1)(a); *People v. Fields,* 202 Ill.App.3d 910, 148 Ill. Dec. 623, 626, 560 N.E.2d 1220, 1223 (4th Dist.1990). That the person acts "knowingly" is an essential element of the offense. *People v. Roberts,* 189 Ill.App.3d 66, 136 Ill.Dec. 565, 571, 544 N.E.2d 1340, 1346 (4th Dist.1989). A person is said to act knowingly with respect to a certain result if that person is "consciously aware that his conduct is practically certain to cause the result." *In re T.A.B.,* 181 Ill.App.3d 581, 130 Ill.Dec. 352, 354, 537 N.E.2d 419, 421 (2d Dist.1989). In this case, based on the undisputed facts, the defendant police officers fail to establish that they had probable cause to arrest D'Artagnan Seay on the charge of criminal damage to property as a matter of law.

To support their arguments on this issue, the defendant police officers rely almost exclusively on the fact that D'Artagnan

3. Defendants Urbikas and Behnke base their motion for summary judgment on this claim on the argument that they are immune from suit. Because the undisputed facts reveal that no constitutional violation occurred, the question of immunity is not at issue. *See Bennett v. Parker,* 898 F.2d 1530, 1534 (11th Cir.1990).

Seay admitted breaking the window. The mere fact that an individual has damaged certain property, however, falls far short of establishing a requisite element of criminal damage to property, namely, that the individual acted knowingly. The statement upon which the defendant police officers rely as D'Artagnan Seay's admission that he broke the window, in fact, indicates that he broke the window accidentally. (Defendants' Rule 12(L) Statement, ¶ 1, citing Seay St. at ls. 3–4). The record at this time contains no evidence to dispute that statement. There is no other evidence in the record as to D'Artagnan Seay's mental state, nor do the defendant police officers even contend that they sought any such evidence. Indeed, the defendant police officers make no representations as to whether their discussion of the incident with the van owner, Mr. Cross, revealed any evidence that D'Artagnan Seay acted knowingly. To establish probable cause, a police officer must pursue reasonable avenues of investigation in order to determine whether a criminal offense has been committed. *BeVier v. Hucal,* 806 F.2d 123, 127–128 (7th Cir.1986); *Davis v. Kirby,* 755 F.Supp. 199 (N.D.Ill.1990). In this case, the defendant police officers were required to obtain some evidence that D'Artagnan Seay acted knowingly before they pursued him on a charge of criminal damage to property. *BeVier,* 806 F.2d at 126 (requiring police to collect some evidence as to mental state of suspect prior to making an arrest). There is nothing in the record to show that the defendant police officers had any such evidence, that they attempted to obtain any such evidence, or that they in any fashion directed their investigation toward the elements of the crime with which D'Artagnan Seay was charged. As such, the sufficiency of their investigation and the existence of probable cause for their arrest of D'Artagnan Seay on a charge of criminal damage to property are matters for a jury to decide. *Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1347 (7th Cir. 1985). Summary judgment, then, is not appropriate on this issue.

D'Artagnan Seay was also charged with aggravated assault, insofar as the defendant police officers claim that he committed an assault upon an individual he knew "to be a peace officer ... engaged in the execution of any of his official duties." *Ill.Rev.Stat.* ch. 38 ¶ 12–2(a)(6).[4] In light of this Magistrate Judge's determination of the prior issue, however, the issue of whether the defendant police officers had probable cause to arrest D'Artagnan Seay on the charge of aggravated assault cannot be resolved at this time. Resolution of this issue would require a bifurcation of D'Artagnan Seay's claim that is not permitted under Fed.R.Civ.P. 56. Courts of this district have held that none of the subsections of Rule 56 allow for summary judgment on part of a claim when the issue of liability remains in dispute as to the rest of the claim. *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill. 1985); *Newman–Green, Inc. v. Alfonzo–Larrain R.,* 612 F.Supp. 1434, 1439–1440 (N.D.Ill.1985); *Capital Records, Inc. v. Progress Record Distrib.,* 106 F.R.D. 25, 29 (N.D.Ill.1985). A determination as to the lawfulness of D'Artagnan Seay's arrest on the charge of aggravated assault, given a disposition of the lawfulness of his arrest on the charge of criminal damage to property, would require a piece-mealing of D'Artagnan Seay's unlawful arrest claim not permitted under Rule 56. Consequently, the defendant police officers are not entitled to summary judgment as to D'Artagnan Seay's claim in Count II.

4. Although this question cannot be resolved in the context of this motion for summary judgment, it would appear that the defendant police officers may fare better on this question than on the issue of the arrest of D'Artagnan Seay for criminal damage to property. It is undisputed that D'Artagnan Seay approached Whalen and Kelly wielding a baseball bat. The only dispute plaintiffs raise is whether, at the time, he knew them to be police officers. (Plaintiffs' Rule 12(M) Statement, at ¶ 19). The real issue, however, is what the defendant police officers reasonably believed at the moment of the arrest. *Beck,* 379 U.S. at 91, 85 S.Ct. at 225. Because they had announced themselves more than once, there is evidence to support their belief that D'Artagnan Seay knew they were police officers when he approached them with the bat.

3. *Count IV—Malicious Prosecution*

Plaintiffs contend, in Count IV, that the defendant police officers maliciously prosecuted each of them. The defendant police officers have moved for summary judgment on this Count only as to the claims of D'Artagnan Seay and David Seay. They argue that the undisputed facts underlying these claims fail to establish the requisite elements of a claim for malicious prosecution under Illinois law.

In Illinois, the circumstances under which a plaintiff may maintain an action for malicious prosecution are narrowly circumscribed. *Joiner v. Benton Community Bank,* 82 Ill.2d 40, 44 Ill.Dec. 260, 262, 411 N.E.2d 229, 231 (1980). The elements of such an action are: "(1) the commencement or continuance of an original criminal or judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Id.* 44 Ill.Dec. at 263, 411 N.E.2d at 232. In this case, the defendant police officers contend the plaintiffs D'Artagnan and David Seay cannot establish the second element, the termination of the proceedings against them in their favor.

D'Artagnan and David Seay were originally charged in delinquency petitions with various misdemeanors in Juvenile Division of the Circuit Court of Cook County. Pursuant to Section 702-7(5) of Illinois' Juvenile Court Act, now *Ill.Rev.Stat.* ch. 37 ¶ 805-4(5), they moved to have the delinquency petitions dismissed and to have criminal prosecution ordered for the charges of criminal damage to property and aggravated assault against D'Artagnan and obstructing a peace officer against David. On February 3, 1988, Judge Sheridan granted their motions, dismissing the delinquency petitions and ordering the State to commence criminal prosecution on the misdemeanor charges. The parties agree that no prosecution has been commenced against either plaintiff since that time.

Illinois law provides that any prosecution of a misdemeanor must commence within one year and six months of its alleged commission. *Ill.Rev.Stat.* ch. 38 ¶ 3-5(b). More than three years have passed since D'Artagnan and David Seay allegedly committed the offenses with which they were charged, and the statute has clearly run. The issue becomes whether the State's abandonment of these cases constitutes "the termination of the proceeding[s] in favor of the plaintiff[s]" *Joiner,* 44 Ill.Dec. at 263, 411 N.E.2d at 232. Illinois courts have interpreted this requirement to mean that a plaintiff may not maintain an action for malicious prosecution if the proceedings were terminated in a manner not indicative of innocence. *Id.; Carlsen v. Village of Oakwood Hills,* 164 Ill.App.3d 396, 115 Ill. Dec. 421, 423, 517 N.E.2d 1107, 1109 (2d Dist.1987). Because a review of the caselaw on this issue reveals that it is open to question, summary judgment is inappropriate on this count.

Illinois courts do not require an adjudication and acquittal on the merits to establish that a proceeding has terminated in a manner indicative of a plaintiff's innocence. *Carlsen,* 115 Ill.Dec. at 424, 517 N.E.2d at 1110. In *Rich v. Baldwin,* 133 Ill.App.3d 712, 88 Ill.Dec. 748, 479 N.E.2d 361 (5th Dist.1985), the court held that a dismissal of a criminal charge on speedy trial grounds constituted a favorable termination of those proceedings for the purposes of a malicious prosecution claim. 88 Ill.Dec. at 752, 479 N.E.2d at 365. The court reasoned that a dismissal of a charge "on other than purely technical grounds (as, for example, lack of jurisdiction or defective pleading) may be said to logically indicate a lack of probable cause for bringing the criminal prosecution so as to form the basis for the malicious prosecution action. *Id.* This holding was based, in part, on the natural assumption that one does not simply abandon a meritorious action once it is instituted. *Id.,* at 751, 479 N.E.2d at 364. Thus, an abandonment of a prosecution may be considered indicative of innocence. *Stainthorp v. Guerra,* No. 88 C 3640 (N.D.Ill. Sept. 15, 1989) 1989 WL 112655, 1989 U.S.Dist. LEXIS 10929, *citing Prosser and Keeton on Torts,* § 119 at 874

(5th Ed.1984). Because the prosecution allowed statute of limitations to run in this case without any attempt to pursue the charges, it cannot be said that plaintiffs would be unable to establish the element of termination of the proceedings in their favor.[5]

The defendant police officers, in arguing for summary judgment on these claims, rely on decisions in *King v. Avila,* No. 88 C 8687 (N.D.Ill. Oct. 27, 1989) and *Filippi v. Muscolino,* No. 89–2560 (Ill.App. 1st Dist. May 15, 1990). Both of these cases are inapposite, however, as they dealt with charges that were stricken with leave to reinstate. Such a disposition of a charge is not even a termination because the State may refile the charge prior to the running of the statute of limitation. *People v. Triplett,* 108 Ill.2d 463, 92 Ill.Dec. 454, 463, 485 N.E.2d 9, 18 (1985). After the statute runs, however, the prosecution of the charge is barred. *Id.* In this case, the statute has clearly run, and the circumstances are quite unrelated to those in *Filippi* and *King.*

In light of these factors, the manner in which the proceedings against D'Artagnan and David Seay were terminated allows the inference that the termination was indicative of their innocence. Thus, genuine issues of material fact remain with respect to the plaintiff's malicious prosecution claims. The defendant police officers, consequently, are not entitled to summary judgment on Count IV.

Based on the foregoing considerations, the defendant police officers have failed to establish their entitlement to summary judgment on Counts II and IV, and that portion of their motion should be denied. With respect to Count I, plaintiffs concede, and the record establishes, that Urbikas and Behnke are entitled to summary judgment. Consequently, that portion of the defendant police officers' motion should be granted.

## III. CLAIM AGAINST THE CITY OF CHICAGO

Plaintiffs bring Count VI of their complaint exclusively against the City of Chicago. Under this count, plaintiffs essentially claim that the City is liable for the unconstitutional acts of the defendant police officers insofar as it maintains a policy or custom of failing to discipline such acts. The City moves for summary judgment on this count, arguing that plaintiff cannot establish that the City's policy toward such matters rises to a level of deliberate indifference to the rights of its citizens.

### A. *Facts*

The evidence presented with respect to Count VI consists of general evidence, bearing on the City's method of handling excessive force complaints against police officers, and specific evidence relating to complaints against the defendant officers in this case. The facts established by this evidence are not in dispute; the parties are instead in conflict over what inferences those facts allow. In order to establish that it is entitled to summary judgment, the City must show that the only reasonable inference to be drawn from those facts must be drawn in its favor. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

The general evidence establishes that the City has a written policy prohibiting the use of excessive force by its police officers. (Defendants' Rule 12(L) Statement, ¶ 16, *citing* Ex. 10: Police Dept. General Order No. 86–S and Ex. 11: Police Dept. Rules 7, 8). The City also has a written policy to investigate complaints of excessive force by police officers. (*Id.* at ¶ 17, *citing,* Ex. 15: List of Complaints). To this end, the

5. While the defendant police officers—perhaps with good reason—do not raise the issue of whether plaintiffs can establish the absence of probable cause for the proceedings, *see supra* at 417–418, the matter does warrant some comment. There is, as previously discussed, some question as to whether there was probable cause for D'Artagnan Seay's arrest, making that issue unamenable to summary judgment. Coupling this factor with the fact that a termination of a proceeding in a plaintiff's favor allows an inference that probable cause for the institution of the proceeding was lacking, there is a genuine issue of material fact as to whether plaintiffs can establish this element of their claim for malicious prosecution. As such, summary judgment would be inappropriate.

City set up a civilian review board, the Office of Professional Standards ("OPS"), to investigate complaints of excessive force. In 1984, the City, under then Mayor Harold Washington, set out to revamp OPS which, it came to believe, had become ineffective and patronage-riden. (Plaintiffs' Rule 12(M) Statement, Ex. 3: Testimony of OPS Director Fogel ("Fogel Testimony"), at 11). At that time, OPS instituted, among other things, certain entry-level requirements for investigators, including a bachelor's degree in criminal justice or a related field, and mandatory training. (Fogel Testimony, at 20). In addition, OPS offices were moved outside of police headquarters. (*Id.*).

An OPS investigation of an excessive force complaint could result in four outcomes: unfounded, exonerated, sustained, and not sustained. (Fogel Testimony, at 31). Each of these outcomes represents a different quantification of the evidence, if any, relating to a complaint. A complaint is "unfounded" when the only witnesses disagree with the complainant's version of the incident. (Fogel Testimony, at 34). An officer is "exonerated" on a complaint when the great weight of the evidence discredits the complainant's version of the incident. (Fogel Testimony, at 34–35). A complaint is sustained when the reverse is true; that is, the great weight of the evidence supports the complainant's version of the incident. (Fogel Testimony, at 36). The vast majority of complaints, however, are "not sustained" [6] (Fogel Testimony, at 35). When there is an equal amount of evidence to support both the complainant's and the officer's versions of the incident, a complaint is found to be "not sustained." (Fogel Testimony, at 35). Essentially, the OPS, in such instances, determines that there is no preponderance of evidence in either sides' favor. (Fogel Testimony, at 35–36). These cases are often the result of situations where it is simply the police officer's word against the complainant's. (Fogel Testimony, at 36).

The OPS takes in approximately 2000 excessive force complaints each year, and sustains 6.2%, or about 125, of these complaints. (Fogel Testimony, at 24–26). Once the OPS sustains a case, it recommends a penalty, and the matter is out of its hands. (Fogel Testimony, at 36–37). The 125 or so sustained cases then go before a panel made up of three top officers in the chain of command above the accused officer for additional review. (Fogel Testimony, at 37). That panel may then either agree or disagree with the OPS's findings; if the panel agrees, it recommends a penalty. (Fogel Testimony, at 37). If the panel agrees with the OPS and recommends a suspension, yet another panel, made up of the accused officer's peers, conducts a hearing on the complaint, at which the police department advocate speaks for the accused officer. (Fogel Testimony, at 37–38). After this panel makes its recommendation, the Superintendent of the Police Department reviews the case and issues his final ruling as to the appropriate penalty. (Fogel Testimony, at 38). The Superintendent agrees with the OPS's findings in 92% of the cases that reach his level. (Fogel Testimony, at 38). The Superintendent's ruling then goes before the Police Board, made up of civilians, which imposes the final penalty. (Fogel Testimony, at 38–39). The Police Board overturns 20% of the cases recommending suspensions, and 62% of the cases recommending firings, with half of those cases reduced to suspensions of thirty days or more. (Fogel Testimony, at 39). The Police Board has the final authority to approve or disapprove the firing of a police officer for excessive force. (Fogel Testimony, at 39). Interestingly enough, Mr. Fogel testified that police officers have been successful in challenging Police Board decisions in court and before the Illinois Labor Relations Board. (Fogel Testimony, at 40).

More specifically, according to the statistics that have been made part of the record, defendant police officers Whalen, Kelly and Urbikas have all been the subject of OPS complaints. Whalen was named in ten cases from 1984 through 1986 involving 39 allegations of excessive force. Of these,

6. Director Fogel testified that "the bulk" of complaints are not sustained.

twelve were determined to be unfounded, six were not sustained, twenty were unfounded or not sustained (the record provides no differentiation), and on one charge, Whalen was exonerated. (Plaintiff's Rule 12(M) Statement, Ex. 2: Summary of Complaint Registers). Kelly was named in one case in 1984 involving five complaints of excessive force, all of which were found to be not sustained. (*Id.*). Urbikas was named in six cases from 1982 through 1987, comprising seventeen complaints of excessive force. (*Id.*). In eight of the complaints, Urbikas was exonerated or the complaints were not sustained (once again, the record provides no differentiation). (*Id.*). One other complaint was determined to be unfounded, and eight others were not sustained. (*Id.*). From 1984 through 1987, Kelly and Urbikas were named in seven cases as a team, comprising thirty-six allegations of excessive force. (*Id.*). In twenty of these instances, Kelly and Urbikas were either exonerated or the complaints were not sustained (again, no differentiation). (*Id.*). Nine other allegations were determined to be either unfounded or not sustained. (*Id.*). Four others were not sustained, and the remaining three were unfounded. (*Id.*). There is no evidence in the record to indicate that Behnke or Schweiger have been named in any complaints.

B. *The Parties' Positions*

Plaintiffs contend that these statistics demonstrate that the City maintains a policy, or custom, of indifference toward police officer's violations of citizens' constitutional rights. They argue that the fact that just 6.2% of excessive force complaints are sustained each year indicates that OPS investigations are perfunctory. They also argue that the record of complaints against Whalen, Kelly and Urbikas supports an inference that the City fails to discipline its police officers, especially since none of the eighty-six allegations against them have resulted in so much as reprimand. The City contends that the mere fact that a small percentage of excessive force complaints are found to have merit, and that none of the complaints against Whalen, Kelly, and Urbikas have ever been sustained, fails to suggest that the City is indifferent to such complaints. The City argues that, without evidence that the OPS findings are wrong or that investigations are indeed perfunctory, the statistics cannot be interpreted in the manner plaintiffs suggest. Given the fact that the Supreme Court has severely circumscribed the instances in which a municipality may be held liable for the unconstitutional acts of its police, this Magistrate Judge finds that the City is entitled to summary judgment on Count VI.

C. *Analysis of Claim Against the City*

In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality could not be held liable for constitutional violations under § 1983 on a *respondeat superior,* or vicarious liability, theory. Since that time, the Court has returned to address this issue on several occasions, often in the context of a municipality's liability for the conduct of its police or penal institution officers. *See, e.g., City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *City of Springfield, Mass. v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Most recently, in *Canton,* the Court delineated what this Magistrate Judge must regard as the final word on the parameters of municipal liability under § 1983.

Prior to its decision in *Canton,* the Court made clear that a municipality would not be held liable for a single instance of unconstitutional conduct and required proof, instead, that a constitutional violation was the direct result of an unconstitutional policy or custom. *Kibbe,* 480 U.S. at 272, 107 S.Ct. at 1122; *Tuttle,* 471 U.S. at 824, 105 S.Ct. at 2436. In *Canton,* the Court provided further explanation of the requirements for establishing municipal liability. In doing so, the Court took pains to adopt a standard that would not open municipalities to court ruling which in effect would result

in the imposition of *de facto respondeat superior* liability. 109 S.Ct. at 1206. The result is a significant burden which plaintiffs in this case simply cannot meet.

While the *Canton* decision dealt with an alleged failure to train police officers, the same concerns are involved in cases like the instant case, involving alleged failures to discipline police officers. *See, e.g., Strauss v. City of Chicago,* 760 F.2d 765 (7th Cir.1985). The Court in *Canton* reiterated its previous statements that, in order for § 1983 liability to attach to a municipality, a plaintiff must show that a particular program of that municipality is so inadequate as to rise to a level of "deliberate indifference" to the rights of citizens. 109 S.Ct. at 1205. The Court stated that the appropriate inquiry is whether a municipality's program is so inadequate that it is obvious that the inadequacy will be likely to result in the violation of constitutional rights. *Id.* As such, the Court added an element of foreseeability to municipal liability. A plaintiff must go beyond establishing the inadequacy of the training or disciplining of police officers; a plaintiff must also show that the municipality should have known that the inadequacy would directly lead to constitutional violations.

In order to establish municipal liability, the *Canton* Court held that a plaintiff *must* demonstrate that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." 109 S.Ct. at 1206. While such a showing is required, however, the Court indicated that, standing alone, it would not be sufficient to establish municipal liability. *Id.* Specifically, the Court stated that it will not "suffice to prove that an injury could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury—causing conduct." *Id.* The Court indicated that such a claim could be made about almost any encounter resulting in an injury because, in the Court's view, "[i]n virtually every instance where a person has his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id., citing Tuttle,* 471 U.S. at 823, 105 S.Ct. at 2436. Thus, while it is essential that a plaintiff make such a showing, it is also essential that a plaintiff establish that the perceived failure on the part of a municipality "reflect[s] deliberate indifference to the constitutional rights of its inhabitants." *Id.* While the Court does not explain what more a plaintiff must show in order to establish deliberate indifference, it would appear that such a situation would be so offensive that, to paraphrase Justice Stewart's famous definition of obscenity, a court will "know it when it sees it." *See Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). Given these considerations, we do not see deliberate indifference in this case.

The record in this case fails to establish that the City's handling of excessive force complaints against police officers reflects a deliberate indifference to citizens' constitutional rights. If anything, the record suggests that the City has followed a course designed to protect those rights, especially in light of the measures it has taken with regard to OPS. When the City perceived inefficiency in OPS investigations, it took several steps to correct that inefficiency, including the appointment of a new director in 1984. In addition, educational and training requirements were instituted for OPS investigators and, to ensure OPS independence, OPS offices were moved outside police headquarters. In light of these positive steps, which the City took to improve OPS performance, we find it difficult indeed to find the City deliberately indifferent to the constitutional rights of its citizens.

We also find that the statistical evidence plaintiffs present fails to establish deliberate indifference on the City's part. Much has been made, in this and other cases, of the extremely low percentage of complaints the OPS sustains, but we are unimpressed by this statistic for two reasons. First, and foremost, the Seventh Circuit has held that such statistics, without more, fail to prove anything. *Strauss,* 760 F.2d at 768–

769. According to the Seventh Circuit, "[p]eople may file a complaint for many reasons, or for no reason at all." *Id.* at 769. Consequently, the Seventh Circuit requires evidence that complaints which were not sustained actually had merit. *Id.* We wholeheartedly concur in this reasoning and feel that, however difficult it might be, more than naked statistics are required to allow an inference of deliberate indifference. Plaintiffs in this case provide no such evidence.

Second, the record provides a rather cogent explanation of why the OPS sustains just six per cent of the complaints filed. Investigations are conducted by trained staff-members with degrees in criminal justice or related fields. These investigations involve comprehensive quantifications of the evidence relating to a complaint into four categories: unfounded, exonerated, not sustained, and sustained. These categories each relate to a differing degree of likelihood that an incident actually occurred. Beyond OPS, excessive force complaints are subject to additional levels of review, whether within the police department or at a civilian level. These procedures can hardly be characterized as "perfunctory," which is what plaintiffs suggest the evidence indicates. Furthermore, these procedures fail to suggest that the City is deliberately indifferent to its citizens' constitutional rights.

This Magistrate Judge has found just two cases allowing municipal liability claims based on such statistical evidence, in the context of motions to dismiss: *McLin v. City of Chicago*, 742 F.Supp. 994 (N.D. Ill.1990) and *Vasquez v. Reid*, No. 90 C 1585 N.D.Ill. Dec. 6, 1990) 1990 WL 207456, 1990 U.S.Dist. LEXIS 16712. In both cases, the court allowed complaints which made allegations of statistics relating to the police department and the OPS as a whole, the record of complaints against the particular police officers involved, and the so-called "code of silence" among police officers. While the instant case is indeed similar to these two cases, we are constrained and, indeed, feel that the prudent course is to follow the holdings of *Canton* and *Strauss*. Statistics of unsustained complaints of excessive force, without any evidence that those complaints had merit, will simply not suffice to establish municipal liability under § 1983.[7] Because the plaintiffs in this case have provided the court with nothing more, the City is entitled to summary judgment on Count VI.

## IV. CONCLUSION

Based on the foregoing, it is recommended that the defendants' motion for summary judgment be granted as to Counts I and VI, and denied as to those relevant portions of Counts II and IV, as provided in this report and recommendation.

DATE: January 18, 1991

---

**7.** A reading of *Canton* and *Strauss* leads one to the inescapable conclusion that the only way a plaintiff can establish municipal liability under § 1983 is to obtain evidence that a municipality has engaged in a pattern of dismissing excessive force complaints even though those complaints had merit. A plaintiff would have to show that such a pattern existed on a general basis, and with respect to the particular officers against whom the complaint is brought. Clearly, this would require resort to the testimony of other police officers. Given the so-called "code of silence" among police officers (as it is in other professions) this could be a formidable task indeed. *See McLin,* 742 F.Supp. at 1001–1002 (and cases cited therein); Fogel Testimony, at 40. Because this "code of silence" cannot be unknown to either the Supreme Court or the Court of Appeals, we must assume that this fact was considered in their decisions. As such, it is clear that the courts feel that municipal liability should attach only in very limited situations. Plaintiffs simply fail to establish that this case falls within those limits.